IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 93-5339

_____

HAROLD L. PARK, Deceased, and
ALICE P. JONES, formerly ALICE P. PARK,

Petitioner-Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE,

Respondent-Appellee.

_____

Appeal from A Decision of the United States Tax Court
_____

(June 30, 1994)

Before GOLDBERG, KING, and WIENER, Circuit Judges.

KING, Circuit Judge:

Alice P. Jones appeals the decision of the United States Tax
Court denying her innocent spouse relief under 26 U.S.C.
§ 6013(e) and § 6004 of the Technical and Miscellaneous Revenue
Act of 1988.  Finding no error, we affirm.


I.   BACKGROUND

A.   FACTUAL BACKGROUND

Harold Park and Alice Jones were married in 1978.  Park was
a certified public accountant and chief financial officer for
Thomas Petroleum Products.  Jones is a high school graduate, who
completed four or five courses in real estate and is a licensed

real estate agent.  In 1981, Park left Thomas Petroleum and became the chief financial officer for a large concern known as B.P.M., Ltd.

Park and Jones maintained two joint checking accounts, one at Spring Branch Bank and the other at Town and Country Bank. Although Park referred to the Town and Country account as his business account, funds from that account were sometimes used to pay personal expenses.  Jones opened the family mail and paid the family's bills from these two checking accounts, including those in connection with an oil and gas exploration venture (Hadl Oil) in which she and Park were involved.  She wrote most of the checks drawn on these accounts, carried the checkbooks with her most of the time, and reconciled the checkbook balances for these accounts on a monthly basis.

In December 1980, Park opened an individual investment account with Financial Securities Corp. (FSC), with an initial investment of $7,500SQpaid by check from the Town and Country account.  Under the terms of the investment agreement, FSC purchased and sold, on Park's behalf, Government National Mortgage Association (GNMA) securities and related forward delivery contracts.  FSC then mailed Park monthly statements of account, which listed inter alia the amounts FSC had received from Park, the GNMA contracts FSC bought or sold on Park's behalf, and Park's open trade equity.  Jones would see these statements when she opened the family mail and, on occasion, would question Park about them.  Park, however, was evasive when

2

responding to Jones' questions and told her that their accountant had recommended the FSC investment as a tax investment, that it should make them money, and that he or their accountant would take care of it.  Jones filed these monthly statements in a shoe box with other financial records, which were turned over to an accountant at tax filing time for preparation of their tax return.

In June 1981, Park received a letter from FSC stating that the balance in the margin account was deficient by $13,000 and that payment had to be made by June 15 to prevent the liquidation of the investment and the closing of the account.  Because Park was out of town at the time the letter arrived, Jones phoned Park about the letter.  He instructed her to mail a check to FSC for $13,000, which she did on June 9, 1981.

Charles Randolph, a certified public accountant, prepared the joint federal income tax return for 1981 at issue in this case for Park and Jones after Jones delivered to Randolph the records needed to prepare the return.  On the return, Park and Jones reported losses totaling $107,456 from the FSC investment (an amount that was more than five times their total cash investment of $20,500SQi.e., the initial $7,500 investment plus the later $13,000 margin call).  They also claimed a total refund of $36,829, which was deposited in the Town and Country account and used to pay off bills incurred in connection with Hadl Oil.

Park and Jones were divorced in April 1986.  Park died in August 1991.

B.  PROCEDURAL HISTORY

The Commissioner issued a notice of deficiency to Park and Jones on August 22, 1984, disallowing the FSC investment loss deduction claimed for 1981.  Park and Jones petitioned the tax court for a redetermination of the deficiency, which the Commissioner had asserted was $266,582.  Jones subsequently amended the petition to assert that she was an innocent spouse under either § 6013(e) or, in the alternative, under § 6004 (the transitional rule) of the Technical and Miscellaneous Revenue Act of 1988 (TAMRA).  The parties then filed a stipulation on September 25, 1989, in which Park and Jones agreed that they were not entitled to the investment loss claimed ($107,456) but that they were instead entitled to a loss deduction of $13,000SQtheir net investment in FSC for 1981.  Park further agreed that he was liable for a $40,065 deficiency in 1981 tax, and he waived further restrictions on assessment and collection of the deficiency.

The tax court determined that Jones had "reason to know" of the substantial understatement on the joint 1981 tax return.  The court accordingly found that Jones did not qualify for "innocent spouse" relief under either § 6013(e) or the transitional rule.  Jones then filed a timely notice of appeal.

II.  STANDARD OF REVIEW

We review the decision of the tax court under the same standards that apply to district court decisions.  Thus, issues

4

of law are reviewed <u>de novo</u>, and findings of fact are reviewed for clear error.  <u>McKnight v. Commissioner</u>, 7 F.3d 447, 450 (5th Cir. 1993).  The tax court's determination that a spouse is not entitled to relief as an "innocent spouse" is reviewable under the clearly erroneous standard.  <u>Buchine v. Commissioner</u>, 20 F.3d 173, 181 (5th Cir. 1994); <u>see</u> <u>McGee v. Commissioner</u>, 979 F.2d 66, 69 (5th Cir. 1992); <u>Sanders v. United States</u>, 509 F.2d 162, 170-71 (5th Cir. 1975).

## III.  DISCUSSION

Jones contends that the tax court clearly erred in finding that she was not entitled to innocent spouse relief under either § 6013(e) or the transitional rule.  She argues that the innocent spouse tests set forth in each of these statutes are substantially different, even though both contain similar language such that the spouse applying for innocent spouse relief must establish that the spouse either did not know or had no reason to know that there was a substantial understatement of income on the joint tax return in question.  We discuss each of these statutes in turn.

### A.  SECTION 6013(e):  THE INNOCENT SPOUSE RULE

Spouses who file joint tax returns are generally jointly and severally liable for tax due on their combined incomes, including interest and penalties.  <u>See</u> 26 U.S.C. § 6013(d)(3).  This general rule is mitigated to some extent by § 6013(e), known as the "innocent spouse rule," which Congress first implemented in

5

1971.  See Act of Jan. 12, 1971, § 1, Pub. L. No. 91-679, 84 Stat. 2063 (1971).  The original provision provided relief only to those innocent spouses who were otherwise subject to liability because of an understatement due to an omission of taxable income.[1]  Id.  In 1984, Congress expanded the scope of the provision, bringing within its ambit deficiencies arising from invalid deductions or credits.  See Tax Reform Act of 1984, Pub. L. No. 98-369, § 424, 98 Stat. 494, 801-03 (1984).  In discussing the purpose of the 1984 amendments, the House Ways and Means Committee explained that

> the present law rules relieving innocent spouses from liability for tax on a joint return are not sufficiently broad to encompass many cases where the innocent spouse deserves relief.  Relief may be desirable, for example, where one spouse claims phony business deductions in order to avoid paying tax and the other spouse has no reason to know that the deductions are phony and may be unaware that there are untaxed profits from the business which the other spouse has squandered.

---

[1] At that time, § 6013(e)(1) read in pertinent part that if
    (A) a joint return has been made under this section for a taxable year and on such return there was omitted from gross income an amount properly includable therein which is attributable to one spouse . . . ,
    (B) the other spouse establishes that in signing the return he or she did not know of, and had no reason to know of, such omission, and
    (C) taking into account whether or not the other spouse significantly benefited directly or indirectly from the items omitted from gross income and taking into account all other facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such omission, then the other shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent that such liability is attributable to such omission from gross income.

H.R. REP. NO. 432, 98th Cong., 2d Sess., at 1502, reprinted in 1984 U.S.C.A.A.N. 697, 1143. Congress also determined that this amended version of the provision was to be applied retroactively to all open tax years to which the Internal Revenue Code of 1954 applies. Id. at 1503.

The innocent spouse provision now reads in pertinent part that if

> (A) a joint return has been made under this section for a taxable year,
> (B) on such return there is a substantial understatement of tax attributable to grossly erroneous items of one spouse,
> (C) the other spouse establishes that in signing the return he or she did not know, and had no reason to know, that there was such substantial understatement, and
> (D) taking into account all the facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such substantial understatement,
>
> then the other spouse shall be relieved of liability for tax . . . for such taxable year to the extent such liability is attributable to such substantial understatement.

26 U.S.C. § 6013(e)(1); see Buchine, 20 F.3d at 180. Failure to prove any one of the four elements set forth in § 6013(e)(1) prevents a taxpayer from qualifying for relief under the "innocent spouse rule." Purificato v. Commissioner, 9 F.3d 290, 293 (3d Cir. 1993), cert. denied, 114 S. Ct. 1398 (1994); Stevens v. Commissioner, 872 F.2d 1499, 1504 (11th Cir. 1989); Purcell v. Commissioner, 826 F.2d 470, 473 (6th Cir. 1987), cert. denied, 485 U.S. 987 (1988); see Buchine, 20 F.3d at 180.

In the instant case, the parties stipulated that a joint return was filed and that the return contained a substantial understatement attributable to a grossly erroneous deduction of

7

Park's.  Jones now asserts that the tax court erroneously determined that she did not qualify for innocent spouse relief because she failed to establish that she, in signing the 1981 joint return, did not know or had no reason to know of this substantial understatement.  She specifically argues that in making this determination, the tax court used the approach set forth in Bokum v. Commissioner, 94 T.C. 126 (1990), aff'd on other grounds, 992 F.2d 1132 (11th Cir. 1993).  She points out that this approachSQwhich focuses on whether she knew or had reason to know of the transaction which gave rise to the substantial understatement and has heretofore generally been used in omission-from-income casesSQwas expressly rejected in a deduction case by the Ninth Circuit in Price v. Commissioner, 887 F.2d 959 (9th Cir. 1989), in favor of an approach which focuses on the taxpayer's knowledge or reason to know that the deduction in question gave rise to a substantial understatement.  She contends that when applied to a deduction case, such as hers, the very narrow transaction approach espoused in Bokum contradicts Congress's intent that innocent spouse provisions should be applied liberally.

We must point out that the tax court determined that Jones had "reason to know" of the substantial understatement under either Price or Bokum.  We thus review the tax court's determination for clear error, after an overview of the transaction approach adopted in omission cases and the views

8

taken by the Price and Bokum courts as to the applicability of that approach in a deduction case.

### 1. Omissions from Income

This court articulated the standard by which a court was to determine whether a spouse claiming innocent spouse relief had "reason to know" of the substantial understatement of tax liability because of an omission from income in Sanders v. United States, 509 F.2d 162 (5th Cir. 1975). In Sanders, we first recognized that because Congress had intended the innocent spouse provision to "remedy a perceived injustice," we should not give the provision an unduly narrow or restrictive meaning. Id. at 166-67. We also explained, however, that Congress did not intend the provision "to provide wholesale relief from joint and several liability" and that we could not "ignore the benefits that both spouses ordinarily derive from the reduction in tax that results when a joint return is filed." Id. at 167 n.6 (citing Sonneborn v. Commissioner, 57 T.C. 373, 380 (1971)). Accordingly, we stated that the proper inquiry in an omission case was whether a reasonably prudent taxpayer under the circumstances of the alleged innocent spouse at the time of signing the return could be expected to know that the tax liability stated was erroneous or that further investigation was warranted. See id. at 166-67 & n.5. We explained that

> we do not interpret this test as excluding consideration of
> the taxpayer's subjective condition when assessing the
> reasonableness of her actions. But neither does it preclude
> the setting of judicially-defined minima of reasonable
> prudence for individual taxpayers or classes of taxpayers.
> Hence, in some circumstances it might be possible for a

9

court to conclude as a matter of law that a given taxpayer had reason to know of omissions from gross income.

Id. at n.5.  In establishing a "duty of inquiry" on the part of the alleged innocent spouse, we focused our analysis on whether the spouse had sufficient knowledge of the facts underlying the transaction which formed the basis of the omitted income such that a reasonably prudent person in the spouse's position would seriously question the gross income as stated on the joint return.  See id. at 167.  Factors relevant to such a determination included the spouse's level of education, the spouse's involvement in the family's business and financial affairs, unusual or lavish expenditures made by the family, and the "culpable" spouse's refusal to be forthright about the couple's income.  Id. at 167-70.

We rejected, however, the argument that a spouse had "no reason to know" of a substantial understatement merely because she had no knowledge of the tax consequences of an omission, finding that such an argument was indistinguishable from the argument that ignorance of the law is an element of the innocent spouse defense.  Id. at 169 & n.14.  In so doing, we adopted the tax court's reading of the statute to say that "if a spouse knows or has reason to know of a transaction that the IRS later determines resulted in income to the couple, that spouse cannot claim the benefit of the innocent spouse provision even though he or she had no reason whatever to suspect that they had received taxable income."  Id. at 169 (emphasis added).  As we explained:

10

> This is perhaps a permissible reading of § 6013(e)(1)(A)-(B) in light of Congress's general intent to extend relief only where equity demands it, but it is difficult to square with a literal reading of the statutory language. Subparagraph (B) mentions "such omission," which obviously refers back to (e)(1)(A) where omissions are described as "an amount <u>properly</u> included . . ." (emphasis added). Since the propriety of including a given sum can finally be determined only by the IRS or the courts, subparagraph (B) seemingly makes ignorance of the fact that known receipts constitute taxable income a valid justification for not knowing or having reason to know of omissions from gross income. Nevertheless, the practical problems that have always prevented acceptance of an ignorance of the law defense in the criminal law area arguably apply just as forcefully here. (internal citation omitted)

<u>Id.</u> at 169 n.14.

Courts have generally agreed that in innocent spouse cases involving the omission of income, relevant inquiry is whether the spouse claiming innocent spouse relief knew or should have known of an income-producing transaction that the other spouse failed to report on their joint return. <u>See, e.g.</u>, <u>Hayman v. Commissioner</u>, 992 F.2d 1256, 1261 (2d Cir. 1993); <u>Erdahl v. Commissioner</u>, 930 F.2d 585, 589 (8th Cir. 1991); <u>Guth v. Commissioner</u>, 897 F.2d 441, 444 (9th Cir. 1990); <u>Quinn v. Commissioner</u>, 524 F.2d 617, 626 (7th Cir. 1975). Hence, knowledge or reason to know of the underlying transaction which produced the omitted income is sufficient to deny innocent spouse relief.

### 2. <u>Deductions</u>

Some courts, however, have determined that the "underlying transaction" inquiry used in omission cases is inappropriate in deduction cases. The leading case in this regard is the Ninth Circuit's decision in <u>Price</u>, whose approach to deduction cases

11

has been expressly adopted by the Second and Eighth Circuits. See Hayman, 992 F.2d at 1261; Erdahl, 930 F.2d at 589. The tax court in Bokum, however, expressly declined to adopt the approach taken in Price. We now turn to the decisions in Price and Bokum.

a. The Price approach

In Price, the Ninth Circuit concluded that the statutory innocent spouse provision requires a spouse to establish that he had no reason to know that the deduction in question, and not the underlying transaction, gave rise to a substantial understatement. In reaching this conclusion, the Price court noted that although the transaction approach was workable in omission cases, that same approach in a deduction case would "wipe out innocent spouse protection" and would "hinder Congress's broader purpose in enacting section 6013(e) . . . by giving the section an unduly narrow and restrictive reading." Id. at 963 n.9.

The court explained that the transaction approach was workable in an omission case because "the understatement is caused by includable income being left off a return. Therefore, it is considerably easier for a spouse to show that she was unaware of the transaction giving rise to the omission, and thus to qualify for relief." Id. Further, the court explained that because a deduction was necessarily recorded on the return, a spouse reading the return would automatically

> be put on notice that some transaction allegedly has occurred to give rise to the deduction. As a result, if knowledge of the transaction, operating of itself, were to bar relief, a spouse would be extremely hard-pressed ever to

12

be able to satisfy the lack of actual and constructive knowledge element . . . in a deduction case."

Id.

Despite its reluctance to embrace the transaction approach in a deduction case, the Price court emphasized that it did not mean to say that a spouse's knowledge of the transaction underlying the deduction was irrelevant. Id. Rather, the court stressed that

> the more a spouse knows about a transaction, ceteris paribus, the more likely it is that she will know or have reason to know that the deduction arising from that transaction may not be valid. We merely conclude that standing by itself, such knowledge does not preclude relief.

Id. The court also made it clear that ignorance of the legal or tax consequences of the deduction giving rise to the deficiency was no defense for a taxpayer seeking innocent spouse relief. Id. at 964. Further, the court explained that if a spouse knew virtually all of the facts pertaining to the transaction which underlies a deduction in question, that spouse's defense "in essence is premised solely on ignorance of the law." Id. (emphasis added). According to the court,

> [i]n such a scenario, regardless of whether the spouse possesses knowledge of the tax consequences of the item at issue, she is considered as a matter of law to have reason to know of the substantial understatement and thereby is effectively precluded from establishing to the contrary.

Id.

The Price court then set out to use its approach in the deduction case before it. Patricia Price, the spouse requesting innocent spouse relief, knew of the existence of her husband's investment and of its rather unusual nature, i.e., Columbian gold

13

mining.  Id. at 960.  More specifically, her husband, Charles Price, had informed her that he had acquired several shares of Cal-Columbian Mines, Ltd. (CCM), that he had flown to Columbia to check on the mine's development, and that the mining operation was a viable investment.  Id. at 960-61.  However, Charles handled all of the family's investment decisions and maintained a separate checking account for investments, which he controlled. Id. at 960.

On the tax return in question, the couple had reported approximately $103,000 in net income which the two of them had earned during the year; they also had claimed a $90,000 deduction for exploration and development expenses related to the investment in the CCM mine.  Id. at 961.  Their total federal income tax liability for the year in question was $391 in self-employment tax.  Id.  Patricia had signed the return, reviewing it cursorily and thinking that the $90,000 "was a bit much."  Id. When she had questioned her husband about the deduction, he assured her that "'if there had been any problems the CPA would . . . never have drawn the papers for us to sign and put his name on them.'"  Id.

The Price court began its analysis by explaining, just as we had in Sanders, 509 F.2d at 167, that a spouse has "reason to know" of the substantial understatement if a reasonably prudent taxpayer in her position at the time she signed the return could be expected to know that the return contained the substantial understatement.  Price, 887 F.2d at 965.  In using the same

14

factors this court has used to determine if a spouse had "reason to know" in an omission case, see, e.g., Sanders, 509 F.2d at 167-68, the Price court determined that a reasonably prudent person in Patricia's position did not have reason to know that the CCM deduction gave rise to a substantial understatement.[2] Price, 887 F.2d at 965.

Having made that determination, the court then addressed whether Patricia nonetheless knew enough facts to put her on inquiry noticeSQi.e., that a reasonably prudent taxpayer in her position would be led to question the legitimacy of the deduction. Id. The court explained that in such a scenario, a duty of inquiry arises, "which, if not satisfied by the spouse, may result in constructive knowledge of the understatement being imputed to her." Id. The court agreed with the tax court that the size of the deduction ($90,000) viz-a-viz the total income reported on the return (just more than $100,000), when considered in light of the fact that Patricia knew of the CCM investment, was enough to put her on inquiry notice. Id. at 965-66. However, the court ultimately determined that Patricia had satisfied her duty of inquiry because she had questioned her husband about the deduction and had refused to sign the return

---

[2] These factors included (1) that Patricia had limited involvement in the financial affairs of her marriage in general and none whatsoever in the CCM investment in particular, (2) that her husband kept a separate checking account for his investments to which Patricia did not have ready access, (3) that the couple had made no unusually lavish expenditures during the time period in question, and (4) that her husband took advantage of Patricia's lack of understanding of their financial affairs and misled her. Price, 887 F.2d at 965.

15

until Charles assured her that a reputable CPA had prepared it.
Id. at 966. Thus, constructive knowledge of the understatement
was not to be imputed to her. Id.

### b. The Bokum approach

The Bokum court expressly declined to follow Price.
Instead, the court concluded that the more general transaction
approach was applicable to both omission and deduction cases.
Bokum, 94 T.C. at 148-51.

In reaching this conclusion, the Bokum court specifically
looked to the decision in Sonneborn v. Commissioner, 57 T.C. 373
(1971), which was decided "with the legislative process still
fresh" the same year in which the innocent spouse provisions were
first enacted. Bokum, 94 T.C. at 151. The court considered the
Sonneborn court's comments concerning Congress's enactment of the
innocent spouse rule in conjunction with Congress's enforcement
of joint and several liability in general for jointly filed tax
returns:

> "The filing of a joint return is a highly valuable privilege
> to husband and wife since the resulting tax liability is
> generally substantially less than the combined taxes that
> would be due from both spouses if they had filed separate
> returns. This circumstance gives particular emphasis to the
> statutory rule that liability with respect to tax is joint
> and several, regardless of the source of income or of the
> fact that one spouse may be far less informed about the
> contents of the return than the other . . . . However, some
> highly inequitable results were called to the attention of
> Congress, particularly where . . . such liability grew out
> of income attributable only to the husband, unknown to the
> wife, and where she had not enjoyed any benefit therefrom.
> It was in an effort to eliminate the unfairness of the joint
> and several liability provisions in such circumstances that
> section 6013(e) was enacted. . . . [Thus,] it must be kept
> in mind that Congress still regards joint and several
> liability as an important adjunct to the privilege of filing

16

> joint returns, and that if there is to be any relaxation of that rule the taxpayer must comply with the carefully detailed conditions set forth in section 6013(e)."

Id. at 151-52 (quoting Sonneborn, 57 T.C. at 380). The court then determined that the same perspective still applied: by filing a joint tax return, taxpayers received benefits but accepted accompanying burdens, such as joint and several liability in most cases.

The court went on to explain that the reasoning in Price was flawed for a number of reasons. Specifically, the court stated that although Price purportedly utilized a "plain meaning" analysis of the innocent spouse statute, the conclusion in Price that if a spouse knew "virtually all of the facts" pertaining to the underlying transaction the spouse was considered as a matter of law to have "reason to know" of the substantial understatement belied such analysis. Moreover, the court emphasized the general rule that exemptions from taxation were to be construed narrowly and pointed out that were it to follow Price, the result in the case before it or in many other cases would not change. Id. at 155.

The Bokum court then set out to analyze the case before it. Richard and Margaret Bokum, who had filed the joint tax return in question, were married in 1941. Id. at 128. Margaret was a high school graduate, had attended college for two years, and was generally not involved in her husband's business affairs. Id. Richard, a geologist, was the founder and president of Bokum

17

Resources Corp., a company that was established to engage in the mining and milling of uranium.  Id.

In 1971, Richard formed Quinta Land & Cattle Co. (Quinta), a corporation formed for the purpose of entering the cattle and ranch business through the purchase of an 11,000-acre cattle ranch in Montana.  Id. at 129.  In forming this corporation, Richard transferred some of his shares in Bokum Resources to Quinta in exchange for all of Quinta's stock.  Id.  Quinta then transferred the Bokum Resources shares and cash to Charles Kyd in exchange for all the shares of Kyd Cattle Co., which had title to the ranch.  Id.  After Quinta bought the ranch, Richard made various improvements to the ranch property, including building a home on the ranch, where Margaret spent summers.  Id.

In 1977, Quinta sold a substantial portion of the ranch for $3,800,000, resulting in a gain of $3,119,045.  Id.  Although Margaret knew of this sale, she did not participate in the business decision to sell the ranch, did not know how much Quinta received on the sale, and did not know what Richard did with the $2,095,000 in net sales proceeds, which were distributed to him. Id.

Quinta distributed a total of $3,553,678 in dividend distributions in 1977 to Richard as its sole shareholder, which included proceeds from the sale of the ranch.  Id. at 130.  On their joint return, Richard and Margaret (1) reported $2,605,272 of those distributions as long-term capital gain and then reduced that amount by $2,087,057, which was purportedly Richard's basis

18

in his Quinta stock, (2) reported another $516,215 as long-term capital gain from dividend distributions from Quinta, and (3) reported $25,132 as their share of net long-term gain from a trust. Id. at 131.

Neither Richard nor Margaret played any role in the preparation of their 1977 tax return, which was prepared by Richard's accountants. Id. at 132. Both Richard and Margaret signed the return without reviewing its contents. Id. However, when the return was filed, the signature block did not include the signatures or any of the information required from paid preparers of tax returns. Id.

Richard and Margaret later received a notice of deficiency, in which the Commissioner informed them that they had understated their taxable income (1) by $606,684 on account of a relocation from long-term capital gain to recapture ordinary income of some of Quinta's gain on the sale of the ranch and a flowthrough of that reallocation to Richard and (2) by an additional $1,054,607 on account of a disallowance of their claim of basis. Id. at 133. The parties stipulated to adjustments to their taxable income and to a deficiency of $513,755.37, but Richard and Margaret later petitioned the tax court for a redetermination of their deficiency and moved to be relieved of their stipulations. Id. at 134. Margaret also petitioned the tax court for innocent spouse relief.

At issue in determining whether Margaret was entitled to innocent spouse relief was whether she had reason to know of one

of the adjustments to taxable income made on the 1977 return: the reduction of Richard's dividend income by Richard's claimed basis in Quinta's stock. Id. at 139. In beginning its analysis, the Bokum court first explained that although it was clear that to qualify for innocent spouse relief Margaret must not have had reason to know of the underlying circumstances which gave rise to the adjustment in issue, it was unclear what the underlying transaction was in this case. Id. at 146. The court then concluded that if the underlying transaction was the sale of the ranch, then because Margaret knew of this transaction, she was disqualified from obtaining innocent spouse statue under § 6013(e). Id.

The court nonetheless went on to determine whether a reasonably prudent taxpayer in Margaret's position was expected to know that a "further investigation" was warranted. Id. at 147-48. Noting (1) that the distribution Richard received from Quinta and the tax treatment of that distribution were not hidden in the recesses of the tax return, (2) that one did not have to be a tax expert to see that most of the distribution reported was being subtracted as basis, and (3) that any one signing the tax return could not have helped but notice that the tax preparer's block was not filled in, thus making one question whether the accountant was really standing behind his preparation of the return, the court concluded that Margaret had a duty to inquire about the correctness of the size of the basis amount subtracted. See id. at 147-48. The court then determined that Margaret did

20

not fulfill her duty of inquiry and hence did not qualify for innocent spouse relief, stating that

> Margaret did not examine the tax return that she signed. She cannot obtain the benefits of section 6013(e) by simply turning a blind eyeSQby preferring not to know ofSQfacts fully disclosed on a tax return, of such a numerical magnitude as would reasonably put her on notice that further inquiry would need be made. Margaret undertook responsibilities when she signed the 1977 joint tax return. She cannot escape these responsibilities by simply ignoring the contents of this tax return.

Id. at 148 (citations omitted).

### 3. The Tax Court's Determination

In the instant case, the tax court determined that Jones had "reason to know" of the substantial understatement under either the Bokum or the Price approach. We conclude that this determination was not clearly erroneous.

Under either approach, Jones' lack of familiarity with the tax consequences of the deduction that gave rise to the substantial understatement would not be sufficient to entitle her to innocent spouse relief under § 6013(e). See Price, 887 F.2d at 964; Bokum 94 T.C. at 145. Moreover, the general standard of inquiry in either approach is that which we stated in Sanders, 509 F.2d at 167: a spouse has "reason to know" of the substantial understatement if, at the time the tax return was signed, a reasonably prudent taxpayer in his or her position could be expected to know that the stated tax liability was erroneous or that further investigation was warranted. See Price, 887 F.2d at 965; Bokum, 94 T.C. at 148.

21

The tax court found that Jones has a high school education, that she took four or five real estate courses, and that she is a licensed real estate agent. The tax court also found that between 1981 and 1983, Jones and Park made annual trips to Missouri at Christmas to visit Park's mother, vacationed annually in Las Vegas, purchased two or three automobilesSQincluding a Lincoln and a Mercedes 450SLSQand that Park purchased a mink coat for Jones. Further, the tax court found that although the FSC investment was a financially complex one on which Park did not consult her and about which Park was evasive to Jones' questions, Jones was aware of the investment, had ready access to all of the documents FSC sent to Park concerning the investment, and knew of the $7,500 and $13,000 checks written to FSC, having written the $13,000 check herself. Hence, under Bokum, Jones' knowledge of the investment with FSCSQthe underlying transaction which gave rise to the substantial understatementSQindicates that a reasonably prudent taxpayer in her position had "reason to know" of the substantial understatement so as to preclude her from obtaining innocent spouse relief.

This result is not altered under the Price approach. Even if we assume that under Price Jones was not aware of sufficient facts to give her reason to know of the substantial understatement, and hence that Jones' defense is not essentially premised solely on ignorance of the law, the question still remains whether she knew sufficient facts such that a reasonably prudent taxpayer in her position would be led to question the

22

legitimacy of the deduction. We believe that under the facts of this case, this question must be answered affirmatively. A cursory glance at the first page of the tax return in question and Form 4797 attached to it plainly indicates that the size of the deduction for FSC investment losses ($107,456) is significantly greater than the amount of the checks that had been written to FSC ($20,500). The same glance would indicate that the deduction for these investment losses amounts to approximately forty-five percent of the gross income reported on the return ($240,967) and to more than the total income reported on the return ($94,053). The size of this deduction, considered in light of the facts that Jones knew of the existence of the FSC investment and that only $20,500 had been paid to FSC, was enough to put Jones on inquiry notice. See Price, 887 F.2d at 966.

Although Jones signed the return without reviewing it, by signing the return she undertook responsibility for it which she cannot escape by simply ignoring its contents. Hence, even given her relative lack of experience in and understanding of complex financial affairs, Jones did not take reasonable steps to determine the accuracy of the return as had the spouse requesting innocent spouse relief in Price. As the Price court noted, a spouse seeking innocent spouse relief cannot turn "a blind eye" to, by preferring not to know of, a deduction fully disclosed on a return when the amount of that deduction is so large that it would reasonably put her on notice that she should inquire further. See Price, 877 F.2d at 965. Under Price, then, Jones

23

did <u>not</u> satisfy her duty of inquiry.  See <u>Hayman</u>, 992 F.2d at 1262 (using the <u>Price</u> approach and explaining (1) that a tax return setting forth a large deduction which offsets income from other sources and substantially reduces or eliminates the couple's tax liability generally puts a taxpayer on notice of the possibility of understatement of tax liability and (2) that in any event a taxpayer who signs a return without reading it is charged with constructive knowledge of its contents); <u>cf.</u> <u>Erdahl</u>, 930 F.2d at 589 ("As <u>Price</u> explains, a taxpayer cannot satisfy the lack of knowledge requirement by claiming that he or she failed to review the return before signing it.")

We therefore conclude that the tax court did not err in determining that under either <u>Bokum</u> or <u>Price</u>, Jones did not establish that she had no "reason to know" of the substantial understatement so as to be afforded innocent spouse relief under § 6013(e).  Although Jones suggests otherwise, we thus have no occasion to determine whether the <u>Bokum</u> or the <u>Price</u> approach should govern deduction cases.[3]

B.  SECTION 6004 OF THE TAMRA

Jones also contends that if she failed to satisfy the "no reason to know" requirement of § 6013(e), she nonetheless satisfied the "no reason to know" requirement of § 6004 of the TAMRASOi.e., the transitional rule.  We disagree.

---

[3] We also have no occasion to determine whether the courts in <u>Price</u> and <u>Bokum</u> actually espoused different approaches.  <u>See</u> <u>Bokum</u>, 94 T.C. at 158 ("[T]he differences in the language used to describe the tests of section 6013(e)(1)(C) are more a matter of semantics than of substance.") (Swift, J., concurring).

24

On November 10, 1988, Congress enacted § 6004 of the TAMRA as a transitional rule with respect to the innocent spouse provision of § 6013(e). This rule provides in pertinent part that if a joint return under § 6013 was filed before January 1, 1985, on which there was an understatement attributable to disallowed deductions which were attributable to activities of one spouse, the other spouse is relieved of liability for tax due from the understatement if

> without regard to any determination before October 21, 1988, the other spouse establishes that in signing the return he or she did not know, and had no reason to know, that there was such an understatement, and
> . . . the marriage between such spouses terminated and immediately after such termination the net worth of the other spouse was less than $10,000 . . . .

See Technical and Miscellaneous Revenue Act of 1988, Pub. L. No. 100-647, 102 Stat. 3685 (1988).

Jones first argues that whatever standard should be applied to determine whether a spouse had "reason to know" under § 6013(e), a "very liberal standard" should be applied to determine "reason to know" under the transitional rule. Although Jones does not indicate what precise standard should be applied, she relies heavily on the phrase in the transitional rule "without regard to any determination before October 21, 1988" for support. She contends that by this phrase, Congress intended to exclude "consideration of any case law [on the 'no reason to know' requirement] decided prior to October 21, 1988," and that thus Congress made it clear that the construction of this

25

requirement was "to be written on a clean slate disregarding all prior precedent."

This argument has little, if any, merit. As written, the transitional rule reads such that a spouse who falls within the rule's objective parameters is entitled to a determination of his tax liability notwithstanding that an earlier determination of his liability was made prior to the enactment of the rule. Such a reading squares neatly with the specific language of the rule which states that the rule applies "notwithstanding any law or rule of law (including res judicata)." Accord In re Freytag, 93-2 U.S.T.C. (CCH) ¶ 50,531, pp. 89,682-683 (Bankr. N.D. Tex. 1993) (presuming, without addressing the issue, that by "determination" Congress meant determination only of the would-be innocent spouse's tax liability, not all prior judicial determinations rendered under the "no reason to know" requirement); Thompson v. Commissioner, 63 T.C.M. (CCH) 2883, 2886 (1992) (same).

Jones also contends that the "no reason to know" requirement of the transitional rule is somehow different from the "no reason to know" requirement of § 6013(e). Again, we find this contention to have no merit.

The "did not know, and had no reason to know" language of the transitional rule virtually mirrors that of § 6013(e), suggesting that Congress intended the "no reason to know" requirement of both provisions to have the same meaning. See Freytag, 93-2 U.S.T.C. (CCH) at 89,682 (applying the same "reason to know" standard under the transitional rule and under

26

§ 6013(e)).  Further, a reading of the transitional rule in conjunction with § 6013(e) reveals that Congress did intend for the transitional rule to provide broader innocent spouse relief under <u>limited circumstances</u> to a certain class of spousesSQi.e., those who filed joint returns with substantial understatements prior to January 1, 1985, and whose marriages had since terminated.  <u>See</u> <u>Thompson</u>, 63 T.C.M. (CCH) at 2884.  For such spouses, Congress eliminated the requirement under § 6013(e)(1)(D), which required a spouse to show that it would be inequitable to hold her liable for the understatement.  In its place, Congress instituted a "net worth" test, relieving the spouse from liability if she met the "no reason to know" requirement and had a net worth of less than $10,000 immediately after the termination of the marriage.  Thus, under the transitional rule, unlike under § 6013(e), Congress afforded innocent spouse relief to a spouse who had benefitted from an erroneous deduction as long as after the termination of the marriage her net worth was less than $10,000.  The institution of this "net worth" test in lieu of a required showing that the spouse did not benefit from the erroneous deduction, however, gives us no basis for concluding that Congress intended to relax the "no reason to know" requirement of the transitional rule, as Jones suggests.

As discussed above, <u>see</u> <u>supra</u> Part III.A.3, Jones has not established that she had "no reason to know" of the substantial understatement under either the <u>Bokum</u> or <u>Price</u> approach.  We must

therefore conclude that the district court did not err in determining that Jones was not entitled to innocent spouse relief under the transitional rule.

## IV.  CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the tax court.