T.C. Memo. 1996-101

UNITED STATES TAX COURT

ESTATE OF RAYMOND E. JONES, DECEASED, DOROTHY J. JONES,
INDEPENDENT EXECUTRIX, AND DOROTHY J. JONES, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 23835-88.                    Filed March 6, 1996.

Sidney Levine, for petitioners.

Melanie R. Urban, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

WELLS, Judge:  Respondent determined deficiencies in and

additions to petitioners Dorothy J. Jones and Raymond E. Jones'[1]

_____

[1]

Raymond E. Jones died during 1989, after the notice of
deficiency in the instant case was issued.  The caption of the
instant case was amended to substitute the Estate of Raymond E.
Jones, Deceased, Dorothy J. Jones, Independent Executrix, for
Raymond E. Jones as a petitioner.  For convenience, we will
hereinafter refer to petitioner Dorothy J. Jones as petitioner,
                                        (continued...)

Federal income taxes as follows:

|      |            | Additions to Tax | |
|------|------------|------------------|------------------|
| Year | Deficiency | Sec. 6653(a)(1)  | Sec. 6653(a)(2)  |
| 1981 | $40,352.17 | $2,017.61        | [1]              |
| 1982 | 1,118.92   | 55.95            | [1]              |

[1] 50 percent of the interest due on the amount of the deficiency.

For the years in issue, respondent also determined that petitioners are liable for increased interest under section 6621(c). Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions, the issues to be decided are: (1) Whether the period of limitation on assessment of the deficiency in and additions to tax for the Joneses' 1981 taxable year expired prior to the date the notice of deficiency was issued; and, if it did not, (2) whether petitioner is entitled to relief under section 6013(e) for the 1981 taxable year.

FINDINGS OF FACT

Some of the facts were stipulated for trial pursuant to Rule 91. The parties' stipulations are incorporated herein by reference and are found accordingly.

--------

[1](...continued)
Raymond E. Jones as Mr. Jones, petitioner and Mr. Jones as the Joneses, and petitioner and the Estate of Raymond E. Jones, Dorothy J. Jones, Independent Executrix, as petitioners.

At the time they filed the petition in the instant case, the Joneses resided in Houston, Texas.

Petitioner married Mr. Jones during 1967. Petitioner and Mr. Jones had both been married previously, and they both had minor children from prior marriages at the time they married. Petitioner had quit school at the age of 15. Mr. Jones had only an eighth grade education. At the time the Joneses married, Mr. Jones worked as a welder on a pipe-laying barge for Brown & Root, an international construction company owned by Halliburton. Until 1984, when he was terminated, Mr. Jones received regular promotions from Brown & Root, eventually rising to the level of vice president.

Shortly after their marriage, the Joneses moved to Bahrain for 6 months and then to England, where they lived for approximately 8 years. Petitioner returned to the United States during 1977 with the children who still lived with them. In order to find a house, petitioner returned from England prior to the time Mr. Jones returned.

After the Joneses returned from England during 1977, petitioner took full responsibility for paying the house and family expenses because Mr. Jones traveled extensively. As part of her household responsibilities, petitioner wrote the checks for the Joneses' family expenses on a jointly held household account at the Citizens State Bank in Sealy, Texas (the household

account).  Mr. Jones deposited his Brown & Root paychecks into the household account.  Petitioner wrote all but 2 of 340 checks drawn on the household account in 1981, paying the monthly and regular household bills, as well as bills totaling $10,000 for improvements to their home.

After the Joneses returned from England during 1977, petitioner also handled the family savings account, transferring between the checking account and the savings account the following amounts on the following dates:  $2,500 on April 25, 1981, $1,500 on May 13, 1981, and $1,500 on June 8, 1981.

Petitioner opened most of the mail that came to their house, except for Mr. Jones' important, personal mail.  As a result of opening the mail, petitioner discovered things that caused her to question Mr. Jones about his financial affairs.

Two or three years after returning from England, petitioner started a small dress shop in Sealy, Texas.  She opened the dress shop without any prior experience in either retail sales or keeping books.  After she opened the dress shop, petitioner hired others to perform bookkeeping and accounting services because she had no interest or expertise in bookkeeping or accounting and she knew how important it was to keep receipts and other records for that purpose.  Emma Rice, petitioner's daughter-in-law, did most of the bookkeeping in the early years of the business, but petitioner subsequently hired an accountant named Jack Singleton

to do the bookkeeping. At that time, as Mr. Jones was also looking for an accountant, petitioner recommended Mr. Singleton to him.

In her dress shop, petitioner had full responsibility for buying the inventory and selling it, areas in which she had skill and interest. During 1980, the dress shop's first year, petitioner grossed $78,207. Petitioner acquired, on her own, the dress shop's first (and continuing) inventory and opened on her own a separate bank account for the dress shop at the Citizens State Bank in Sealy, Texas.

Mr. Jones did not write checks on petitioner's dress shop bank account, and she did not keep him apprised of the operations of the dress shop. Occasionally, petitioner used the household account for transactions involving the dress shop.

During its first year, petitioner operated the dress shop in leased space, but petitioner subsequently moved the shop to a building she purchased in 1981 for $42,500. The building afforded a larger space and, during 1981, petitioner opened a bridal shop in addition to the dress shop. During 1981, the dress and bridal shops employed three to four employees per day. During 1981, the dress and bridal shops grossed $128,549.67, almost double the first year's results, and reported a profit. After opening the bridal shop, petitioner opened a third business, a tea room that served lunch.

Petitioner operated her businesses for approximately 9 years, working very long hours. Mr. Jones took no responsibility for the dress shop or other businesses petitioner undertook in Sealy, Texas, and he had very little to do with them. On the other hand, Mr. Jones did not ignore petitioner's efforts, and he helped her when she asked him for his assistance.

Petitioner began noticing a difference in her relationship with Mr. Jones about the time they returned from England and she started her businesses (i.e., prior to 1981), when Mr. Jones became more and more private, even secretive. Nonetheless, petitioner possessed information about many of Mr. Jones' financial affairs. During relevant times, she knew Mr. Jones was buying stock in Halliburton, the parent company of Brown & Root, because she saw the contemporaneous deductions taken out of his paycheck. Petitioner kept track of Mr. Jones' earnings from Brown & Root. She also knew that he had perfected certain inventions while working for Brown & Root. She knew that Mr. Jones bought stock in the Citizens State Bank of Sealy. She knew how much she and Mr. Jones paid for the small house they acquired in Sealy in 1974, which they used for summer vacations while they were living in England, and she knew how it was financed. She knew about the 95 acres of land Mr. Jones purchased in 1971, how much he paid for it, how it was used, how it was financed, and how it came to be mortgaged again. She knew about the 23 acres

of land Mr. Jones purchased in 1970 for cash. She knew that Mr. Jones purchased U.S. savings bonds through his paycheck during the period 1972 to 1982. She knew about a 5-acre tract of land near Sealy that Mr. Jones sold in 1982, and how the buyer paid for it. She knew that Mr. Jones consulted with David Lye about the purchase of a lumber yard in 1980 or 1981. She knew that Mr. Jones wanted to build a Holiday Inn in Sealy.

After petitioner found and recommended Mr. Singleton to Mr. Jones (during 1979 or 1980) and they met with him briefly, Mr. Jones took responsibility for transmitting all pertinent information to Mr. Singleton and seeing that their joint income tax returns were prepared. Mr. Singleton prepared the 1981 joint income tax return filed by the Joneses. Mr. Singleton found both petitioners difficult to deal with when he needed information.

The Joneses filed their joint income tax return for the taxable year 1981 on August 23, 1982. On their 1981 return, the Joneses claimed deductions with respect to an investment in an art tax shelter.

In addition to the deductions claimed for the art tax shelter, the Joneses claimed partnership losses from Auburn Mining Joint Venture (related to Munro Shuman) (Auburn Mining partnership) in the amount of $76,674 and Choate Square Joint Venture (Choate Square partnership) in the amount of $11,798.92. During 1981, Mr. Jones had invested $10,000 in the Auburn Mining

partnership using funds out of his expense account at Citizens State Bank, in Sealy, Texas. During 1981, petitioner did not know that Mr. Jones maintained a separate bank account for his business and travel expenses. However, she knew that Mr. Jones' employer, Brown & Root, paid for his travel by advancing him funds, and that he did not deposit those funds into their household account. Nonetheless, petitioner did not know about the $10,000 investment in the Auburn Mining partnership when Mr. Jones made it.

On their 1981 return, the Joneses claimed an overpayment of $17,732.28, resulting at least in part from the deductions taken from the Auburn Mining and Choate Square partnerships. The 1981 return, with its overpayment claim, contrasted with their 1979 and 1980 returns, which respectively reported an overpayment of only $33 and an amount due of $1,444. A substantial portion of the refund claimed on the 1981 return was carried over to be used as an additional payment on the income tax liability shown on the joint return filed by the Joneses for their 1982 taxable year.

Petitioner signed the returns filed for taxable years 1979 and 1980, as well as the return filed for the 1981 taxable year. Although she signed the tax returns, petitioner did not see the complete returns or inspect each of the pages given to her because Mr. Jones always presented them for signature at inconvenient times. Petitioner did not inspect the portions of

the tax returns Mr. Jones gave her to sign during 1981 because, at that time, she trusted him.

Upon audit of the Joneses' 1981 return, the Internal Revenue Service (Service) proposed disallowing the Schedule C loss claimed by the Joneses with respect to the art tax shelter and allowing only their cash outlay as a deduction. On August 20, 1984, the Joneses agreed to the assessment of additional tax for 1981 resulting from disallowance of the Schedule C loss with respect to the art tax shelter by signing Form 1902-B, Report of Individual Income Tax Examination Changes. The Joneses made an advance payment of $610.52 on the art tax shelter adjustment on August 22, 1984, that covered the additional tax as originally proposed plus interest. On September 29, 1984, and March 1, 1985, respectively, the Joneses and a representative of the Service also executed a Closing Agreement on Final Determination Covering Specific Matters concerning only the art tax shelter for which the Joneses had claimed deductions for 1980, 1981, and 1982.

On April 25, 1985, the Joneses and a representative of the Service executed a Form 872-A, Special Consent to Extend the Time to Assess Tax, extending the period of limitation for assessment with respect to their 1981 year. The Form 872-A provided that the Service could assess additional tax with respect to the 1981 taxable year at any time subject only to certain limitations.

The relevant portions of the Form 872-A stated as follows:

(1) The amount(s) of any Federal income tax due on any return(s) made by or for the above taxpayer(s) for the period(s) ended December 31, 1981 may be assessed on or before the 90th (ninetieth) day after: (a) the Internal Revenue Service office considering the case receives Form 872-T, Notice of Termination of Special Consent to Extend the Time to Assess Tax, from the taxpayer(s); or (b) the Internal Revenue Service mails Form 872-T to the taxpayer(s); or (c) the Internal Revenue Service mails a notice of deficiency for such period(s)* * *

(2) This agreement ends on the earlier of the above expiration date or the assessment date of an increase in the above tax that reflects the final determination of tax and the final administrative appeals consideration. An assessment for one period covered by this agreement will not end this agreement for any other period it covers. Some assessments do not reflect a final determination and appeals consideration and therefore will not terminate the agreement before the expiration date. Examples are assessments of: (a) tax under a partial agreement; (b) tax in jeopardy; (c) tax to correct mathematical or clerical errors; (d) tax reported on amended returns; and (e) advance payments.

On June 17, 1985, the Service assessed the additional tax owed with respect to the art tax shelter adjustments for the 1981 year. On April 13, 1988, the Service received from the Joneses a Form 872-T, terminating the consent granted by the Form 872-A for the 1981 taxable year. On June 21, 1988, within 90 days of its receipt of the Form 872-T, the Service issued to the Joneses a statutory notice of deficiency covering both the 1981 and 1982 taxable years.

OPINION

The first issue we must decide is whether the period of limitation on assessment of the deficiency in and additions to

tax against the Joneses for their 1981 taxable year had expired prior to the date the notice of deficiency was issued.

Generally, the Commissioner must assess any deficiency within 3 years of the filing of a return. Sec. 6501(c). A taxpayer and the Commissioner can agree to extend the assessment deadline if they memorialize their agreement in writing prior to the expiration of the original assessment period. Sec. 6501(c)(4). The agreement terminates only by the methods set out on its face. Kernen v. Commissioner, 902 F.2d 17, 18 (9th Cir. 1990); Estate of Camara v. Commissioner, 91 T.C. 957, 962 (1988).

The bar of the statutory period of limitation is an affirmative defense which must be specifically pled and proved. Rules 39, 142(a); Mecom v. Commissioner, 101 T.C. 374, 382 (1993), affd. without published opinion 40 F.3d 385 (5th Cir. 1994); Amesbury Apartments, Ltd. v. Commissioner, 95 T.C. 227, 240 (1990). Petitioners may establish a prima facie case by proving the filing date of their 1981 tax return and that the notice of deficiency was mailed after the normal 3-year expiration date for the period of limitation. Mecom v. Commissioner, supra at 382; Amesbury Apartments, Ltd. v. Commissioner, supra at 240-241; Adler v. Commissioner, 85 T.C. 535, 540 (1985). The burden of going forward then shifts to respondent. J.H. Rutter Rex Manufacturing Co. v. Commissioner, 853 F.2d 1275, 1281 (5th Cir. 1988), affg. in part, revg. in part

and remanding T.C. Memo. 1987-296; Armes v. Commissioner, 448 F.2d 972, 974 (5th Cir. 1971), affg. in part, revg. in part and remanding T.C. Memo. 1969-181; Mecom v. Commissioner, supra at 382; Adler v. Commissioner, supra at 540-541.

Respondent's burden is met by the receipt into evidence of one or more properly executed, facially valid, written agreements extending the period of limitation on assessment along with evidence that the notice of deficiency was mailed prior to the end of the extended period. J.H. Rutter Rex Manufacturing Co. v. Commissioner, supra at 1281; Mecom v. Commissioner, supra at 382-383; Adler v. Commissioner, supra at 540. Once respondent makes such a showing, the burden of going forward with the evidence shifts back to petitioners to prove their contentions with respect to agreements. J.H. Rutter Rex Manufacturing Co. v. Commissioner, supra at 1281; Mecom v. Commissioner, supra at 383; Adler v. Commissioner, supra at 541.

An agreement extending the period of limitation on assessment is a unilateral waiver of a defense by a taxpayer; the interpretation of the terms contained in the agreement is governed by contract principles. Stange v. United States, 282 U.S. 270 (1931); Kronish v. Commissioner, 90 T.C. 684, 693 (1988); Piarulle v. Commissioner, 80 T.C. 1035, 1042 (1983). The terms of the parties' agreement are determined from their objective manifestations of mutual assent as shown by their overt

acts.  <u>Mecom v. Commissioner</u>, <u>supra</u> at 384-385.  In signing a written agreement, the parties manifest assent to its provisions.  <u>Id.</u> at 385.  To construe the terms of the parties' agreement, therefore, we look to the language of the written agreement.  <u>Id.</u> at 384, 385; <u>Kronish v. Commissioner</u>, <u>supra</u> at 693.[2]  Only if a written agreement is ambiguous do we look behind it to ascertain the intentions of the parties.  <u>Rink v. Commissioner</u>, 100 T.C. 319, 325 (1993), affd. 47 F.3d 168 (6th Cir. 1995).  A written agreement is ambiguous if it can reasonably be interpreted to have more than one meaning.  <u>Woods v. Commissioner</u>, 92 T.C. 776, 780 (1989).  If the written agreement is ambiguous, the finder of fact may resort to extrinsic facts to interpret the parties' intent in signing the agreement.  <u>Id.</u>

With the foregoing in mind, we look to the words the parties to the agreement used to memorialize their agreement.  The Joneses and the Service's agent signed Form 872-A, which contained the following language relating to termination of the agreement:

> (1) The amount(s) of any federal income tax due on any return(s) made by or for the above taxpayer(s) for the period(s) ended December 31, 1981 may be assessed on or before the 90th (ninetieth) day after:  (a) the Internal Revenue Service office considering the case receives Form 872-T, Notice of Termination of Special Consent to Extend the Time to Assess Tax, from the taxpayer(s); or (b) the Internal Revenue Service mails Form 872-T to the taxpayer(s); or (c) the Internal Revenue Service mails a

---

[2]

See <u>Masraff v. Commissioner</u>, T.C. Memo. 1989-638.

notice of deficiency for such period(s). * * *

(2) This agreement ends on the earlier of the above expiration date or the assessment date of an increase in the above tax that reflects the final determination of tax and the final administrative appeals consideration. An assessment for one period covered by this agreement will not end this agreement for any other period it covers. Some assessments do not reflect a final determination and appeals consideration and therefore will not terminate the agreement before the expiration date. Examples are assessments of: (a) tax under a partial agreement; (b) tax in jeopardy; (c) tax to correct mathematical or clerical errors; (d) tax reported on amended returns; and (e) advance payments.

Petitioners argue that the language of the Form 872-A is clear and that the assessment made with respect to the art tax shelter adjustment falls within the language of paragraph (2), thereby terminating the extension on June 17, 1985, the date of the assessment. Accordingly, we must decide the meaning of "the assessment date of an increase in * * * tax that reflects the final determination of tax and the final administrative appeals consideration." As the record establishes that a facially valid, written consent was properly executed, the burden of going forward shifts back to petitioners to prove that the consent terminated in accordance with its terms.

The record contains no evidence of Appeals Office involvement in the art shelter matter. Accordingly, petitioners rely solely on the Service's assessment of tax concerning the art shelter adjustment as "the final determination of tax" thereby terminating the extension provided in the Form 872-A. Petitioners contend that any assessment of tax for the 1981 year

is what is meant by the term "tax" in the phrase "the final determination of tax". Respondent, on the other hand, argues that only a closing agreement covering all adjustments or issues for an entire year can finalize a taxpayer's liability for that year. Respondent's argument presumes that the phrase "the final determination of tax" means the final determination of the taxpayer's tax for the entire year.

We agree with respondent that the words used in the agreement evince an intent that only a final determination of the Joneses' tax for the entire period covered by the agreement would terminate the agreement. Paragraph (2) of the agreement states that "Some assessments do not reflect a final determination" and then sets forth some examples, including the assessment of "tax under a partial agreement" and the assessment of "advance payments". We interpret the closing agreement with respect to the art tax shelter to be a partial agreement, in that the closing agreement did not purport to cover the Joneses' entire 1981 taxable year. The closing agreement was limited only to the art tax shelter adjustment. Consequently, the assessment of tax with respect to the art tax shelter adjustment was not a final determination of tax as called for in the Form 872-A. See Drummond Co. v. United States, 70 AFTR 2d 92-5185, 92-2 USTC par. 50,339, (N.D. Ala. 1992).

Even were we to conclude that the words used in the Form 872-A are susceptible of more than one meaning and, therefore,

that we must resort to extrinsic facts to interpret the parties' intent, we would reject petitioners' interpretation because it is inconsistent with the very purpose that the parties must have had in mind when they executed the Form 872-A. The Joneses signed the closing agreement with respect to the art tax shelter in September 1984, and the Service approved it in March 1985. The Form 872-A was signed by the Joneses on April 1, 1985, and the Service signed it on April 25, 1985. The obvious purpose for signing a Form 872-A is to extend the period during which the Service is permitted to send a notice of deficiency to the taxpayer. However, the Joneses had already entered into a closing agreement with the Service covering the art tax shelter adjustment, and the signing of a Form 872-A therefore would have been a useless act as to that adjustment. As the parties had agreed to the liability arising out of the art shelter adjustment by executing a closing agreement, the Service could have immediately assessed the tax on that adjustment. Consequently, the only logical purpose that could have been served by entering into the extension agreement would have been to allow the Service to audit other items on the Joneses' 1981 return and determine whether any additional tax might be due, e.g., from disallowance of other deductions claimed on the return. If the Joneses had merely wanted to keep the assessment period open for the art shelter adjustment, they could have signed a limited or restricted Form 872-A limiting the extension to the art tax

shelter adjustment.  They, however, did not sign such a limited consent; instead, they chose to extend the period of limitation as to all matters concerning their 1981 year for an indefinite period by signing the unrestricted Form 872-A.

We cannot conclude on the record in the instant case that the Joneses intended, at the time they signed the Form 872-A, to ascribe the meaning to the phrase "the final determination of tax" to which they now adhere.  No evidence was offered that would point to such an intent on the part of the Joneses.  The failure of such evidence is significant because petitioner testified at trial and therefore could have enlightened the Court about such an intent, a fact peculiarly within her knowledge.  Petitioner's failure to testify as to such an intent suggests that the testimony would have been unfavorable to petitioners. Mecom v. Commissioner, 101 T.C. at 385 n.17 (and cases cited therein).  We think that by signing the Form 872-A under the circumstances of the instant case, the Joneses' actions were more consistent with respondent's interpretation of the agreement, i.e., that the parties' intended the term "tax" in the phrase "the final determination of tax" to mean the Joneses' tax liability for the entire 1981 year.

Based on the foregoing, we hold that, because there was no closing agreement signed for the Joneses' entire 1981 year, sec. 7121; Estate of Meyer v. Commissioner, 58 T.C. 69, 70 (1972); see

also Botany Worsted Mills v. United States, 278 U.S. 282, 288 (1929)[3], and the assessment made on June 17, 1985, was not a final determination of tax, the Form 872-A did not terminate. Instead, it terminated when the notice of deficiency was sent.

We next consider the innocent spouse issue. The innocent spouse provisions of the Internal Revenue Code provide that a spouse is relieved of liability for tax attributable to an understatement of tax on a return in cases where: (a) A joint return has been filed for the taxable year; (b) on the return there is a substantial understatement of tax attributable to grossly erroneous items of one spouse; (c) the other spouse establishes that in signing the return he or she did not know, and had no reason to know, that there was such an understatement; and (d) taking into account all of the facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax attributable to the understatement. Sec. 6013(e)(1).

Failure to prove any one of the four elements set forth in section 6013(e)(1) prevents a taxpayer from qualifying for relief under the "innocent spouse rule". Park v. Commissioner, 25 F.3d 1289, 1292 (5th Cir. 1994), affg. T.C. Memo. 1993-252. Petitioners have the burden of proving all four elements. Estate of Krock v. Commissioner, 93 T.C. 672, 677 (1989).

---

[3]

See also Fudim v. Commissioner, T.C. Memo. 1994-235.

The parties do not dispute that the Joneses filed a joint return for the 1981 taxable year.[4]  Additionally, respondent agrees that the deductions claimed with respect to the Auburn Mining partnership were grossly erroneous.[5]  Finally, respondent concedes that petitioner did not actually know of Mr. Jones' investment in the Auburn Mining partnership.  The dispute, therefore, as to the Auburn Mining partnership centers on two questions; i.e., whether petitioner had reason to know of the substantial understatement and whether it is inequitable to hold petitioner liable for the understatement.  As to the Choate Square partnership, in addition to the foregoing two matters, the question of whether the deductions were grossly erroneous remains to be decided as well.

The relevant standard by which a claim that a taxpayer is an innocent spouse must be judged is whether "a reasonably prudent taxpayer in his or her position could be expected to know that the stated tax liability was erroneous or that further investigation was warranted."  Park v. Commissioner, supra at

---

[4]

The parties have agreed that for purposes of defining "substantial understatement" under sec. 6013(e):  (1) The taxable year 1987 is petitioner's "preadjustment year"; (2) petitioner's adjusted gross income for 1987 does not exceed $20,000; and (3) the deficiency attributable to the Auburn Mining partnership in 1981 exceeds 10 percent of petitioner's adjusted gross income for 1987.

[5]

Respondent does not concede that the deductions for the Choate Square partnership taken on the Joneses' 1981 return are grossly erroneous.

1298.  See <u>Sanders v. United States</u>, 509 F.2d 162, 168 (5th Cir. 1975).  Even complete deference to the husband's judgment and the alleged innocent spouse's role as a traditional homemaker will not always sustain an innocent spouse claim.  See, e.g., <u>Stevens v. Commissioner</u>, 872 F.2d 1499, 1505-1506 (11th Cir. 1989), affg. T.C. Memo. 1988-63.  "[A] spouse seeking innocent spouse relief cannot turn 'a blind eye' to, by preferring not to know of, a deduction fully disclosed on a return when the amount of that deduction is so large that it would reasonably put her on notice that she should inquire further."  <u>Park v. Commissioner</u>, <u>supra</u> at 1299.

Significant factors to an analysis of the innocent spouse claim are the taxpayer's level of education, the taxpayer's experience in business affairs and bookkeeping, the taxpayer's level of involvement in the family's financial affairs, the presence of expenditures that appear lavish or unusual when compared to the taxpayer's past standard of living, the "culpable" spouse's openness concerning the family finances, whether the tax treatment of the transaction in issue was hidden in the recesses of the return, whether the taxpayer relied on an expert, and whether the taxpayer reviewed the return.  <u>Park v. Commissioner</u>, <u>supra</u> at 1298-1299; <u>Sanders v. United States</u>, <u>supra</u> at 167; <u>Bokum v. Commissioner</u>, 94 T.C. 126, 146-149 (1990), affd. 992 F.2d 1132 (11th Cir. 1993).  We consider the interplay among the various factors.  Different factors will predominate in

- 21 -

different cases.  <u>Bliss v. Commissioner</u>, 59 F.3d 374, 378 (2d Cir. 1995), affg. T.C. Memo. 1993-390.

In the instant case, petitioner ran her own businesses, having started them prior to the year in question.  She expanded them successfully during, and after, 1981.  She handled the buying and selling of the inventory, purchased a building out of which the businesses were operated, and paid the mortgage.  She operated her businesses independently of Mr. Jones in spite of her lack of formal education.

Because Mr. Jones traveled extensively and for long periods of time, petitioner managed the family and household finances.  Petitioner also managed the Joneses' monthly bills and large expenditures, freely transferring funds between accounts to do so.  The evidence shows that petitioner managed most of the family money, except for Mr. Jones' expense account.  Petitioner demonstrated by her testimony that she kept track of Mr. Jones' earnings and where they went.  Petitioner knew about many of Mr. Jones' investments and asked about others.

Petitioner testified that she saw at least part of the 1981 return that she signed and that she also saw the amount of the refund claimed.  She also testified that the amount of the refund claimed on the 1981 return was very large compared to the overpayment claimed on the 1979 return and the tax shown as due on the 1980 return.  She signed the 1981 joint return just below the place on the return which reflected the unusual overpayment

of tax.  The deductions were not hidden in the recesses of the return but were clearly set forth on Schedule E.  The sum of the losses from Schedule E, totaling $106,755, was set forth on line 17 on the front page of the return.  Clearly, under such circumstances, petitioner should have been on notice of the substantial and unusual losses.  Petitioner, however, testified that she did not examine the return in any detail and that she signed the return even though she had questions about it.  As stated above, petitioner is not entitled to turn "a blind eye" to such facts.  Park v. Commissioner, 25 F.3d at 1299.

As to the notion that "an expert" prepared the Joneses' return, thereby relieving petitioner from pursuing questions she might otherwise have raised, it was petitioner who found Mr. Singleton and was the first to make use of his services.  She introduced him to Mr. Jones who then hired him to do their joint return for 1981.  She had some responsibilities in helping the accountant and Mr. Jones prepare the return; i.e. gathering the information on their charitable contributions and her businesses.  Under the circumstances, we do not think that she should now be allowed to claim that she was denied access to the return preparer.

Based on the record in the instant case, the image we have of petitioner is that of an intelligent, inquiring, and diligent businesswoman.  Even though she lacked formal education, her experience in the business world was certainly a good substitute.

Petitioner was an enterprising individual, savvy enough in business affairs and bookkeeping to have built the successful businesses that she operated.  We are satisfied, based on the record in the instant case, that petitioner had the ability to understand that there was a substantial understatement on the 1981 return and that she was sufficiently put on notice that she needed to inquire further into the partnership deductions generating the understatement.  Consequently, we hold that petitioner has failed to prove that she did not have reason to know that there was an understatement of tax on the return for the 1981 taxable year and that petitioner is therefore not entitled to relief as an innocent spouse under section 6013(e).[6]

To reflect the foregoing,

<u>Decision will be</u>

<u>entered under Rule 155</u>.

---

[6]

Because we hold that petitioner had reason to know of the understatement, we need not address the questions of whether the Choate Square partnership deductions were grossly erroneous or whether it would be inequitable to hold petitioner liable for the deficiency attributable to the understatement.