HAROLD P. WARREN, DECEASED, NORMA F. WARREN, SURVIVING SPOUSE, AND NORMA F. WARREN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Warren v. Commissioner
Docket No. 5315-84
United States Tax Court
T.C. Memo 1995-236; 1995 Tax Ct. Memo LEXIS 238; 69 T.C.M. (CCH) 2759; June 1, 1995, Filed *238 Decision will be entered for respondent. For petitioners: Declan J. O'Donnell. For respondent: Sara J. Barkley and Robert A. Varra. DAWSON, ARMEN
DAWSON; ARMEN
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: This case was assigned to Special Trial Judge Robert N. Armen, Jr., pursuant to the provisions of section 7443A(b)(4) of the Internal Revenue Code of 1986, as amended, and Rules 180, 181, and 183. [1] The Court agrees with and adopts the Opinion of the Special Trial Judge, which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE ARMEN, Special Trial Judge: Respondent determined deficiencies in petitioners' Federal income taxes for the taxable years and in the amounts as follows: Year
Deficiency
1978
$ 11,761.55
1979
19,205.00
1980
28,659.00
1981
920.24
Respondent also determined *239 an addition to tax under section 6651(a)(1) for failure to timely file for the taxable year 1978 in the amount of $ 1,176.16. After concessions by petitioners, the only issue remaining for decision is whether petitioner Norma F. Warren (petitioner) qualifies for relief as an innocent spouse under section 6013(e) for the taxable years 1978 through 1981. FINDINGS OF FACT Some of the facts have been stipulated, and they are so found. Petitioners resided in Scottsdale, Arizona, at the time that their petition was filed with the Court. General background
Petitioners were married in 1963 and remained married until the death of petitioner Harold P. Warren (Mr. Warren) in the mid-1980's. Petitioner graduated from high school in Texas. She was a good student who excelled in math. Petitioner attended college for at least 2-1/2 years and studied architectural engineering. She did not, however, obtain a degree. After college, petitioner worked for a geological company in Amarillo, Texas. She subsequently moved to Houston, Texas, and worked in the drafting department of an oil company for several years. In 1963 petitioner married Mr. Warren, an insurance salesman, who was 13 *240 years her senior. Like petitioner, Mr. Warren did not have a college degree. After her marriage, petitioner worked as a draftsperson in the geological department of a gas company in El Paso, Texas, for approximately 6 months. At some point, petitioner and Mr. Warren took a real estate course, obtained real estate licenses, and moved to Arizona City, Arizona. In Arizona City, petitioner and Mr. Warren worked for a real estate company. Petitioner sold lots and received commissions on sales, although she was not actually considered a salesperson. Mr. Warren became a manager for the company. In 1972, petitioner and Mr. Warren moved to the Phoenix area, where they purchased a house for approximately $ 77,000. After relocating, petitioner was not employed outside the home, but stayed at home in order to care for petitioners' two children. In 1974, petitioner and Mr. Warren moved to Denver, Colorado, although they did not sell their house in Arizona. Petitioner and Mr. Warren lived in Denver for approximately 2 years. During this period, Mr. Warren worked in real estate, selling subdivided lots. Upon returning to the Phoenix area in 1976, petitioner and Mr. Warren formed a Colorado *241 corporation by the name of Creative Marketing Consultants, Ltd. (Creative Marketing). At all relevant times, petitioner was an officer of Creative Marketing, as well as its sole shareholder. Petitioners' primary source of income during the years 1978 through 1980 was the salary received by Mr. Warren from Creative Marketing. Creative Marketing was engaged in the sale of interests in tax shelters (collectively, the tax shelters) promoted by William A. Kilpatrick (Mr. Kilpatrick), including the Kilpatrick Coal tax shelter and the Kilpatrick Methanol tax shelter. The wages paid to Mr. Warren during this period were for his activities as a salesperson of the tax shelters. As the selling agent, Creative Marketing received 40 percent of the cash paid by each purchaser of a tax shelter interest sold by Mr. Warren. By no later than early 1977, petitioner knew that the products being marketed by Creative Marketing were being offered as tax shelters. She understood the concept of a tax shelter, as well as the nature of the tax shelters promoted by Mr. Kilpatrick. Petitioner was acquainted with Mr. Kilpatrick and his wife and socialized with them on a number of occasions. However, petitioner *242 never discussed business with Mr. Kilpatrick. Petitioner and Mr. Warren "invested" in certain of the tax shelters sold by Creative Marketing, including Erie Coal, a Kilpatrick Coal tax shelter, and Consolidated Fuel and Realty Company, a Kilpatrick Methanol tax shelter. Petitioner and Mr. Warren paid no cash for their interests in these tax shelters but merely executed nonrecourse notes. This arrangement was made available to petitioners because of Mr. Warren's involvement as a salesman in the marketing of Kilpatrick tax shelters. Petitioner was aware of these "investments". Petitioners' Federal income tax returns for the taxable years 1978 through 1981 (collectively, the income tax returns) contain substantial understatements attributable to: (1) Deductions for advance minimum royalties, (2) losses from Consolidated Fuel and Realty, and (3) net operating losses resulting therefrom. Petitioner signed each of the income tax returns that she and Mr. Warren filed with the Internal Revenue Service. Mr. Warren never made a conscious effort to keep business "out of the house". Nevertheless, Mr. Warren's business dealings were rarely discussed at home. Mr. Warren generally paid *243 the household bills. However, he provided cash and credit cards to petitioner to enable her to purchase items for the household and to buy clothing for herself and for their children. Petitioner trusted Mr. Warren and had confidence in his judgment. Thus, when Mr. Warren requested that petitioner sign the income tax returns, she did so without examining them and without hesitation. She did so without knowing whether the accountant who prepared the income tax returns was reputable or competent. Mr. Warren died in or about 1985. Petitioner was the sole beneficiary of his estate. During their marriage, petitioner and Mr. Warren did not live extravagantly, nor did their standard of living vary dramatically over the course of their marriage. Petitioner currently resides in a 3,500 square foot house with four bedrooms, a fenced-in yard, desert landscaping in front, and a swimming pool. Before Mr. Warren's death, petitioners owned the house jointly. Petitioner filed for bankruptcy in the United States Bankruptcy Court for the District of Arizona in February 1987. The income tax returns
On their joint income tax returns for 1978 through 1981, petitioner and Mr. Warren reported *244 total income and income tax as follows: Year
Total income
Income tax
1978
$ 8,705 $ --
1979
(81,966)
--
1980
[1] (13,485)
--
1981
[2] 13,270 [3] 346
1978 return
Petitioner and Mr. Warren attached a Schedule C to their income tax return for 1978. The Schedule C identified Mr. Warren as being the proprietor of a coal mining activity. [2] The Schedule C reported no income and claimed a single deduction for "advance mineral royalty" in the amount of $ 45,000. A net loss in that same amount was then claimed on the last line of the Schedule C and was used to dramatically reduce income reported from other sources, including Mr. Warren's reported compensation from Creative Marketing in the amount of $ 42,000. *245 The largest number appearing on the 1978 income tax return was the $ 45,000 loss claimed in respect of Mr. Warren's coal mining activity. Petitioner and Mr. Warren itemized their deductions for 1978 on a Schedule A. They claimed total deductions of $ 11,146, consisting of the following: Taxes
$ 2,458
Interest
8,460
Contributions
138
Miscellaneous
90
Total
$ 11,146
The largest single deduction was for home mortgage interest in the amount of $ 6,931. 1979 return
Petitioner and Mr. Warren attached a Schedule C to their income tax return for 1979. As before, the Schedule C identified Mr. Warren as being the proprietor of a coal mining activity. [3] The Schedule C reported no income and claimed a single deduction for "advance mineral royalty" in the amount of $ 45,000. A net loss in that same amount was then claimed on the last line of the Schedule C and was carried to line 13 (Business income or (loss)) of the first page of the Form 1040. *246 Petitioner and Mr. Warren also attached a Schedule E to their income tax return for 1979. Part III of the Schedule E claimed a $ 100,000 partnership loss from Consolidated Fuel & Realty Co.
The Schedule C loss and the Schedule E partnership loss were used to completely offset income reported from other sources, including Mr. Warren's reported compensation from Creative Marketing in the amount of $ 60,000. The largest number appearing on the 1979 income tax return was the $ 100,000 loss claimed in respect of Mr. Warren's partnership interest in Consolidated Fuel and Realty Company. 1980 return
Petitioner and Mr. Warren attached a Schedule E to their income tax return for 1980. Part III of the Schedule E claimed a $ 94,117 partnership loss from Consolidated Fuel & Realty Co.
The Schedule E partnership loss was used to completely offset income reported from other sources, including Mr. Warren's reported compensation from Creative Marketing in the amount of $ 55,851. The second largest number appearing on the 1980 income tax return was the $ 94,117 loss claimed in respect of Mr. Warren's partnership interest in Consolidated Fuel & Realty Co. The largest number was the $ *247 95,451 loss representing "total income" on page 1 of the Form 1040. 1981 return
No Schedule C in respect of any mining activity nor any Schedule E in respect of Consolidated Fuel & Realty Co. was attached to the 1981 return filed by petitioner and Mr. Warren. Moreover, no wage income from Creative Marketing was reported. However, on page 1 of the Form 1040, a "1979 NOL" in the amount of $ 81,966 and a "1980 NOL" in the amount of $ 3,270 were claimed. These two deductions served to completely offset the other relatively modest income reported. A loss of $ 71,966 was reported as the "total income" for the year. The largest number appearing on the 1981 income tax return was the "1979 NOL" in the amount of $ 81,966. 1982 return[4]
On their joint income tax return for 1982, petitioner and Mr. Warren reported *248 total income, without regard to any NOL carryforward, of $ 6,171. After taking into account the claimed NOL carryforward in the amount of $ 81,966, a loss in the amount of $ 65,795 was reported as "total income". This amount was also reported as adjusted gross income. Without regard to the claimed NOL carryforward, the 1982 return reported adjusted gross income of $ 6,171. Notice of deficiency
In the notice of deficiency, respondent disallowed the $ 45,000 Schedule C deduction claimed for "advance mineral royalty" for each of the taxable years 1978 and 1979. The parties have stipulated that this deduction has no basis in law or in fact for either the taxable year 1978 or the taxable year 1979. In the notice of deficiency, respondent also disallowed the $ 100,000 Schedule E partnership loss and the $ 94,117 Schedule E partnership loss claimed in respect of Consolidated Fuel & Realty Co. for the taxable years 1979 and 1980, respectively. The parties have stipulated that these losses have no basis in law or in fact. In the notice of deficiency, respondent also determined that petitioner and Mr. Warren did not sustain any net operating loss in either the taxable year 1979 *249 or the taxable year 1980. Accordingly, respondent disallowed the $ 81,966 NOL carryforward claimed on the 1980 return, as well as the NOL carryforwards claimed on the 1981 return in the aggregate amount of $ 85,236. The parties have stipulated that the NOL carryforwards claimed by petitioner and Mr. Warren on their 1979 and 1980 returns result from grossly erroneous items, namely, the deductions claimed for "advance mineral royalties" and the partnership losses claimed in respect of Consolidated Fuel & Realty Co.
Finally, the parties have stipulated that the income tax returns filed by petitioner and Mr. Warren for the taxable years 1978 through 1981 contain substantial understatements of tax attributable to grossly erroneous items, namely, the deductions claimed for "advance mineral royalties" and the partnership losses claimed in respect of Consolidated Fuel & Realty Co.
ULTIMATE FINDING OF FACT In signing the joint income tax returns for the years in issue in this case, petitioner had reason to know that there were substantial understatements of tax attributable to grossly erroneous items on such returns. OPINION The parties have resolved all of the issues in this case except *250 whether petitioner qualifies for relief as an innocent spouse under section 6013(e) for the 4 taxable years in issue. Section 6013(a) permits a husband and wife to file a joint income tax return. This is a valuable privilege because the filing of a joint return generally serves to decrease the spouses' overall tax liability. Sec. 1. The privilege of filing a joint income tax return does not come without a price, however. Thus, as a general rule, spouses who file joint income tax returns are jointly and severally liable for the full amount of tax due on the combined incomes. Sec. 6013(d)(3). Joint and several liability applies even under circumstances where "one spouse may be far less informed about the contents of the return than the other". Sonnenborn v. Commissioner, 57 T.C. 373, 381 (1971). However, the general rule is somewhat mitigated by the innocent spouse provisions of section 6013(e). Section 6013(e) relieves a spouse of liability, to the extent provided by the statute, for tax (including interest, penalties, and other amounts) if each of the following four requirements is satisfied: (1) A joint Federal income tax return was filed *251 by the spouses; (2) there is a substantial understatement of tax attributable to grossly erroneous items of the other spouse; (3) in signing the return, the putative innocent spouse neither knew, nor had reason to know, of such substantial understatement; and (4) taking into account all the facts and circumstances, it would be inequitable to hold the putative innocent spouse liable for the deficiency attributable to the understatement. Sec. 6013(e)(1). If the substantial understatement is attributable to any claim of a deduction, credit, or basis by the other spouse in an amount for which there is no basis in fact or law, then an additional requirement must be satisfied, namely, the substantial understatement must exceed a specified percentage of the putative innocent spouse's adjusted gross income for the "preadjustment year". Sec. 6013(e)(4). The putative innocent spouse has the burden of proving that each of the foregoing requirements is satisfied. Rule 142(a); Bokum v. Commissioner, 94 T.C. 126, 138 (1990), affd. 992 F.2d 1132 (11th Cir. 1993). Failure to satisfy any of the requirements will preclude a holding that *252 the putative innocent spouse is entitled to relief under section 6013(e). Stevens v. Commissioner, 872 F.2d 1499, 1504 (11th Cir. 1989), affg. T.C. Memo. 1988-63. The parties have stipulated that petitioner and Mr. Warren filed a joint income tax return for each of the taxable years in issue. The parties have also stipulated that on each of those returns there was a substantial understatement of tax attributable to grossly erroneous items, and we shall proceed on the basis that the grossly erroneous items were items of Mr. Warren. Further, we are satisfied that the substantial understatements of tax exceeded the requisite percentage of income in 1982, the preadjustment year. Therefore, in order to be relieved of liability as an innocent spouse, petitioner must prove: (1) In signing the income tax returns, she neither knew, nor had reason to know, of the substantial understatements of tax; and (2) it would be inequitable to hold her liable for the deficiencies attributable to such understatements. Sec. 6013(e)(1)(C) and (D). Although the parties declined to file briefs in this case, we understand petitioner to contend *253 that at the time she signed the income tax returns for the years in issue, she neither knew nor had reason to know of the substantial understatements of tax, and that it would be inequitable to hold her liable for the deficiencies. In contrast, we understand respondent to contend that petitioner either knew or had reason to know of the substantial understatements at the time that she signed the returns in question, and that it would not be inequitable to hold her liable. For the following reasons, we agree with respondent that petitioner had reason to know of the substantial understatements of tax at the critical time, and that therefore petitioner does not qualify for relief as an innocent spouse. The Court of Appeals for the Ninth Circuit, the circuit to which this case is appealable, has described the "reason to know" standard as follows: A spouse has "reason to know" of the substantial understatement if a reasonably prudent taxpayer in her position at the time she signed the return could be expected to know that the return contained the substantial understatement. * * * Factors to consider in analyzing whether an alleged innocent spouse had "reason to know" of the substantial *254 understatement include: (1) the spouse's level of education; (2) the spouse's involvement in the family's business and financial affairs; (3) the presence of expenditures that appear lavish or unusual when compared to the family's past levels of income, standard of living, and spending patterns; and (4) the culpable spouse's evasiveness and deceit concerning the couple's finances. * * * Even if a spouse is not aware of sufficient facts to give her reason to know of the substantial understatement, she nevertheless may know enough facts to put her on notice that such an understatement exists. * * * Such notice is provided if the spouse knows sufficient facts such that a reasonably prudent taxpayer in her position would be led to question the legitimacy of the deduction. * * * In such a scenario, a duty of inquiry arises, which, if not satisfied by the spouse, may result in constructive knowledge of the understatement being imputed to her. * * * [Price v. Commissioner, 887 F.2d 959, 965 (9th Cir. 1989).]
We turn now to the factors outlined in Price v. Commissioner, supra, to determine whether petitioner *255 had "reason to know" of the substantial understatements. Petitioner did not graduate from college. However, she studied architectural engineering in college for several years and later received a real estate license. We conclude that petitioner's educational level was such that, even if she had examined her income tax returns only in a cursory fashion, she would have recognized that substantial understatements might exist. The second factor, petitioner's involvement in the family's business and financial affairs, is particularly significant in this case. Petitioner testified that she had little involvement with the operations of Creative Marketing, and that she and Mr. Warren rarely discussed Mr. Warren's business dealings. However, Creative Marketing was wholly owned by petitioner during 1976 through 1982. Petitioner was also an officer of Creative Marketing during those same years. Moreover, by no later than early 1977, petitioner knew that the products being marketed by Creative Marketing were being offered as tax shelters and that Mr. Warren was "investing" in the tax shelters on petitioners' behalf. The following exchange between petitioners' attorney and petitioner *256 illustrates petitioner's understanding of tax shelters: Q: You use the word tax shelter. Do you know what you are talking about? What is a tax shelter? What did you think it was when you first heard it? A: Way to save money. I don't know. Four-to-one writeoff. That's all I remember -- all I know. I don't know what it involved. * * * Q: The words -- but the words tax shelter implies some advantage? A: Yes, like tax deductions. As to what they were, I don't know.
We conclude that although petitioner may not have been intimately involved in the daily operations of Creative Marketing, she was nonetheless involved with Creative Marketing as its sole shareholder and as an officer. Moreover, she understood that the products being marketed by Creative Marketing were tax shelters. Even more significantly, she understood that tax shelters had become a part of the family's investment portfolio and a way to save money by reducing the family's tax burden. With regard to the third factor, we accept petitioner's testimony that she and Mr. Warren did not live extravagantly nor did their standard of living vary dramatically over the course of their marriage. We take *257 note, however, that their standard of living during the years in issue was financed, at least in part, by their failure to report and pay the Federal income taxes for which they are liable. The fourth factor to be considered is the culpable spouse's evasiveness and deceit concerning the couple's finances. Mr. Warren never made a conscious effort to keep business "out of the house". Petitioner and Mr. Warren also socialized with the Kilpatricks, which we view as further evidence that Mr. Warren did not attempt to isolate petitioner from knowledge about the family finances. Rather, petitioner chose to rely on Mr. Warren regarding financial matters. Based on the record in this case, we are convinced that, at a minimum, petitioner knew enough facts to put her on notice that substantial understatements might exist. See Price v. Commissioner, supra at 965. "Tax returns setting forth large deductions, such as tax shelter losses offsetting income from other sources and substantially reducing or eliminating the couple's tax liability, generally put a taxpayer on notice that there may be an understatement of tax liability". Hayman v. Commissioner, 992 F.2d 1256, 1262 (2d Cir. 1993), *258 affg. T.C. Memo. 1992-228. Under circumstances where a spouse knows facts sufficient to cause a reasonably prudent taxpayer in her position to question the legitimacy of a deduction, a duty of inquiry arises. In Price v. Commissioner, supra, the Court of Appeals for the Ninth Circuit concluded that a taxpayer with limited experience in, or understanding of, financial affairs had satisfied her duty of inquiry by questioning her husband about an incongruously large deduction on their Federal income tax return and by withholding her signature until her husband assured her that a "putatively reputable" certified public account had prepared the return. In the present case, petitioner did not even look at the income tax returns that she was signing. At a minimum, petitioner failed to satisfy her duty of inquiry, and she is therefore charged with constructive knowledge of the substantial understatements appearing in the income tax returns. Price v. Commissioner, supra at 965; see Park v. Commissioner, 25 F.3d 1289, 1299 (5th Cir. 1994) ("by signing the return [the *259 putative innocent spouse] undertook responsibility for it which she cannot escape by simply ignoring its contents"), affg. T.C. Memo. 1993-252; see also Lauer v. Commissioner, T.C. Memo. 1994-579("a taxpayer is not permitted to obtain the benefits of section 6013(e) by turning a blind eye to -- by preferring not to know of -- facts clearly within his or her grasp, or fully disclosed on a return that the taxpayer signed"); McComb v. Commissioner, T.C. Memo. 1994-577 ("A spouse may not obtain protection as an innocent spouse in deduction cases by turning a blind eye to facts fully disclosed on a return which, if she had looked at the return, would reasonably have put her on notice that further inquiry was needed"). By failing to even peruse the returns in question, petitioner chose to ignore facts that would have given her reason to know of the substantial understatements. Indeed, even the most cursory perusal of those returns would have revealed what petitioner's own attorney characterized as "whopping deductions" and "giant losses". A reasonably prudent person in petitioner's position would *260 have certainly questioned the legitimacy of deductions and losses totally disproportionate to reported income if such a person had looked at the returns. Petitioner, by declining to do so, failed in her duty of inquiry. Accordingly, we hold that petitioner, in signing the income tax returns for the years in issue, had reason to know, within the meaning of section 6013(e)(1)(C), of the substantial understatements of tax. Because we so hold, we need not address whether it would be equitable or inequitable to hold petitioner liable for the deficiencies in tax attributable to those understatements. In view of the foregoing, we sustain respondent's determination that petitioner is liable for the deficiencies and the addition to tax as set forth in the notice of deficiency. Sec. 6013(d)(3). In order to give effect to our disposition of the disputed issue, as well as petitioners' concessions, Decision will be entered for respondent. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
1. Without regard to the claimed NOL carryforward from 1979 in the amount of $ 81,966.↩
2. Without regard to either the claimed NOL carry-forward from 1979 in the amount of $ 81,966 or the claimed NOL carry-forward from 1980 in the amount of $ 3,270.↩
3. Self-employment tax.↩
2. The business name of the activity was not disclosed. However, the Schedule C relates to Erie Coal.↩
3. The business name of the activity was not disclosed. However, the Schedule C relates to Erie Coal.↩
4. Respondent did not determine any deficiency for the taxable year 1982. The year is relevant, however, because it constitutes the "preadjustment year" within the meaning of section 6013(e)(4)(C)↩.