T.C. Memo. 2007-167

UNITED STATES TAX COURT

CYNTHIA K. BEATTY, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 22047-04.                    Filed June 27, 2007.

<u>Caroline D. Ciraolo</u>, for petitioner.

<u>James H. Harris, Jr.</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

CHIECHI, <u>Judge</u>:  This case arises from a request for equita-
ble relief (relief) under section 6015(f).[1]  We must decide
whether respondent abused respondent's discretion in denying

---

[1]All section references are to the Internal Revenue Code in
effect at all relevant times.  All Rule references are to the Tax
Court Rules of Practice and Procedure.

petitioner relief under section 6015(f) for each of the taxable years 1988 though 1997 and 2000.  We hold that respondent abused respondent's discretion in denying petitioner such relief.

FINDINGS OF FACT

All of the facts in this case, which the parties submitted under Rule 122, have been stipulated by the parties and are so found.

Petitioner resided in Ocean City, Maryland (Ocean City), at the time she filed the petition.

In 1978, petitioner married Michael Beatty (Mr. Beatty). She was still married to him when the parties submitted this case under Rule 122.

In 1975, petitioner received an associate degree from Villa Julie College.  Mr. Beatty stopped attending school when he was in the ninth grade.

From 1975 until 1980, petitioner worked as a medical secretary for Washington Hospital Center in Washington, D.C.

Around 1977, Mr. Beatty obtained a Small Business Administration loan in order to purchase a delicatessen and bakery business that he incorporated under the name "MKB Donut and Deli, Inc." (MKB).  Mr. Beatty failed to pay his withholding tax liabilities with respect to MKB, and respondent filed Federal tax liens with respect to such liabilities.  In 1980, MKB filed for bankruptcy, and he eventually lost MKB and all of his savings.

Around 1981, a bank foreclosed on a house which Mr. Beatty had purchased in 1976 and in which petitioner and he had been residing since shortly after that purchase.

In 1981, Mr. Beatty began working as a self-employed disc jockey. From 1981 until the summer of 1998, petitioner was a full-time homemaker, although she did help Mr. Beatty in his work as a disc jockey. During that period, Mr. Beatty's earnings as a self-employed disc jockey were the only source of income of petitioner and Mr. Beatty.

Around 1996, petitioner and Mr. Beatty purchased a townhouse in Ocean City. Except for signing certain documents, petitioner was not involved in that purchase.

From May through August 1998, petitioner worked as a bartender, for which she received $4,187. During the summers of 1999, 2000, and 2001, petitioner worked as a hostess at a restaurant, for which she received $4,387, $6,819, and $4,581, respectively. Except for basic cashier duties that petitioner had while working as a bartender and a restaurant hostess, petitioner had no other financial responsibilities in those (or any other) jobs that she has had.

At all relevant times, Mr. Beatty managed the finances of petitioner and himself and made all of their financial decisions, including managing all bank accounts and reviewing all bank statements in his and/or petitioner's name. In addition, at all

relevant times, if petitioner needed to purchase groceries or other personal items, Mr. Beatty provided her with the cash or a check to do so.

At certain relevant times, Mr. Beatty was unable to open bank accounts or obtain credit in his name because of his poor credit rating. Instead, Mr. Beatty used petitioner's name to open bank accounts, which he used for both personal and business purposes. Mr. Beatty also obtained credit cards in petitioner's name, which he used for business purposes. In addition, Mr. Beatty used petitioner's name to finance the purchase of at least one vehicle that he used for business purposes.

Petitioner and Mr. Beatty did not timely file Federal income tax returns and State income tax returns for any of their taxable years 1988 through 1999. On a date not disclosed by the record in 1999, Mr. Beatty was indicted by the State of Maryland for willful failure to file a State income tax return (State return) for each of the taxable years 1995, 1996, and 1997. On May 8, 2000, Mr. Beatty pleaded guilty to failing willfully to file a State return with the State of Maryland for each of those taxable years.

On September 8, 2000, as a result of pleading guilty to failing willfully to file a State return with the State of Maryland for each of the taxable years 1995, 1996, and 1997, Mr. Beatty was sentenced to 15 years in prison. That sentence was

suspended, and Mr. Beatty was placed on supervised probation for five years. As a condition of his probation, Mr. Beatty was required to file a Federal income tax return (Federal return) and a State return for each of his taxable years 1995 through 1999.

Around September 7, 2000, petitioner and Mr. Beatty filed jointly Form 1040, U.S. Individual Income Tax Return (Form 1040), for each of their taxable years 1998 (1998 joint return) and 1999 (1999 joint return). In their 1998 joint return and their 1999 joint return, petitioner and Mr. Beatty reported tax owed of $46,710 and $31,533, respectively, which they did not pay at the time they filed those returns. The liabilities reported in those returns (unpaid liabilities for 1998 and 1999) are solely attributable to Mr. Beatty.

On September 14, 2000, petitioner filed a petition for bankruptcy (bankruptcy petition) under Chapter 7 of Title 11 of the United States Code (Chapter 7) with the United States Bankruptcy Court for the District of Maryland (Bankruptcy Court). Petitioner filed the bankruptcy petition because of excessive credit card debt that she was unable to pay and that had been generated by Mr. Beatty, who used credit cards in petitioner's name to charge business expenses. On January 23, 2001, the Bankruptcy Court adjudicated petitioner bankrupt under Chapter 7.

In 2001, on a date not disclosed by the record, the Comptroller of Maryland directed Mr. Beatty to file a Federal return

and a State return for any taxable year after 1987 for which Mr. Beatty had failed to file such returns.

In November 2001, Mr. Beatty's accountant, Eric Vinson, prepared a Federal return for petitioner and Mr. Beatty with respect to each of their taxable years 1988 through 1997 and 2000, each of which petitioner and Mr. Beatty signed. Those returns, which respondent received on the dates indicated, showed the following tax owed:

| Taxable Year | Date Received by Respondent | Tax Owed |
|---|---|---|
| 1988 | 11/7/01 | $12,849 |
| 1989 | 11/7/01 | 13,644 |
| 1990 | 11/7/01 | 14,255 |
| 1991 | 11/7/01 | 14,823 |
| 1992 | 11/7/01 | 15,088 |
| 1993 | 11/7/01 | 15,533 |
| 1994 | 11/7/01 | 15,902 |
| 1995 | 11/7/01 | 20,726 |
| 1996 | 11/7/01 | 30,440 |
| 1997 | 11/26/01 | 41,174 |
| 2000 | 10/18/01 | 14,399 |

(For convenience, we shall refer collectively to the Federal returns that petitioner and Mr. Beatty filed jointly for the taxable years 1988 through 1997 and 2000 as the joint returns for the years at issue.)

The liabilities reported in the joint returns for the years at issue (unpaid liabilities for the years at issue) are solely attributable to Mr. Beatty. Petitioner did not review those joint returns before she signed them. At the time petitioner signed the joint returns for the years at issue, she believed that Mr. Beatty would be incarcerated if she did not sign such returns.

Around February 28, 2002, petitioner filed with respondent Form 8857, Request for Innocent Spouse Relief (And Separation of Liability and Equitable Relief), with respect to, inter alia, taxable years 1988 through 1997 and 2000. Petitioner attached a statement to that form, which stated in pertinent part:

> Mrs. Beatty is not responsible, and should not be held liable, for the underpayment of tax reflected on the joint returns filed. First, she signed the returns solely because she was instructed to do so by her husband's accountant. She was not advised nor was she aware that she had the option of filing separately. She was not told that by signing the returns, she was jointly and severally liable for any tax reported thereon. She would not have understood the information reported as all items, with the sole exception of her wages, were attributable to her husband and his business, of which she had no knowledge. And, most importantly, she was told that failure to promptly file all prior federal and state tax returns would result in her husband going to jail.

On or about April 25, 2002, at the request of respondent, petitioner submitted to respondent Form 886-A, Innocent Spouse Questionnaire (petitioner's Form 886-A). In petitioner's Form 886-A, petitioner provided the responses indicated to the follow-

ing questions:

   2.    If you are requesting relief from tax reported on the original return:

      a.    Did you review the tax return before signing it?  **No.**

      b.    At the time you signed the return, were you aware there was a balance due IRS?  Please explain in detail.  **She did not review the returns and, therefore, was not aware that a balance was due.  Had she been advised that a balance was due, she would have assumed that she was not liable * * * [because] income tax had been properly withheld from her * * * wages and she believed that this meant that she, individually, would not owe any tax.**

      c.    Describe how, at the time you signed the return, you and your spouse planned to pay the tax due?  **Mrs. Beatty did not review the returns.  She signed the returns solely because she believed that her failure to do so would result in her husband going to prison.  She also believed * * * [that] because income tax had been withheld from * * * [her] paychecks, that she * * * would not * * * personally owe any taxes.**

   *       *       *       *       *       *       *

   8.    During the years involved, did you and your spouse have a joint bank account?

      **Mr. and Mrs. Beatty never opened or maintained joint bank accounts.  In fact, the only accounts in Mrs. Beatty's name (prior to 2001) were those opened by and used solely by Mr. Beatty.**

      a.    What was the extent of accessibility to these accounts?  **Mr. Beatty maintained access to all accounts.  Mrs. Beatty did not use the accounts.**

b.  Did you review the bank statements when you received them?  **No.**

c.  Did you balance the checkbook or bank statements?  **No.**

d.  Did you receive and open the mail?  **Mrs. Beatty did not receive or open any financial or business mail, including bills, bank statements, etc.**

e.  What bills did you pay?  **None.**

f.  What bills did your spouse pay?  **Mr. Beatty paid all of the household expenses.**

g.  Were any bills paid out of a joint account? If so, which ones?  **Not applicable.**

\*        \*        \*        \*        \*        \*        \*

9.  For the year you are requesting relief:

a.  What was your involvement in the preparation of the income tax return?  **Mrs. Beatty was not involved in any way in the preparation of the returns.**

b.  What was your spouse's involvement in the preparation of the income tax return?  **Mr. Beatty provided all supporting documents to his accountant.**

c.  Who prepared the return?  **Eric Vinson, CPA, Ocean City, Maryland.**

d.  Did you assist, sort or provide any information to the return preparer?  **No.**

e.  Did you or your spouse consult anyone regarding this return, at the time of signing (IRS, Attorney, CPA, Tax Preparer, etc.)?  Please explain.

**Mrs. Beatty never consulted with any professional regarding tax matters.  Mrs. Beatty's husband consulted with an accountant, Eric**

Vinson, of Ocean City, Maryland, who advised that he should file joint returns to minimize the tax liability. Mr. Vinson prepared joint returns, and Mr. Beatty presented those returns to his wife and told her where to sign. Mrs. Beatty signed the returns because she believed that failure to do so would result in her husband going to jail. She was not aware that she had the option of filing separately, or that she could have chosen not to file at all.

10. If you were required to pay the tax liability, would it cause an economic hardship? **Yes.** Please Explain.

**Mrs. Beatty works during the summer months in Ocean City, Maryland. During the "off season," it is nearly impossible for Mrs. Beatty to obtain full-time employment.**

a. If a hardship would exist, please provide a list of your current monthly income and expenses.

Monthly Income: **$0.**

Monthly expenses: **Mr. Beatty pays the monthly household expenses. When Mrs. Beatty is employed during the summer months, her wages (minimal at best) are used for basic expenditures such as gas, groceries, etc.**

\*       \*       \*       \*       \*       \*       \*

14. At the time the return was filed, what assets did you and your spouse own (cars, boats, homes, property, stocks, bonds, etc.)?

**In or around April 1993, the Beattys moved into a townhouse in Ocean City, Maryland. Mr. Beatty told Mrs. Beatty that they owned the property, and Mrs. Beatty went about fixing up the property as needed. In fact, Mr. Beatty had negotiated with someone for whom he worked on a regular basis to rent the property with an option to**

**buy. Approximately 3 years later, the Beatty purchased the property, with Mr. Beatty explaining to Mrs. Beatty that she just needed to sign the papers to make their ownership "official."**

**The Beattys never opened or maintained joint bank accounts. In fact, the only accounts in Mrs. Beatty's name (prior to 2001) were those opened by and used solely by Mr. Beatty. Due to Mr. Beatty's bankruptcy in 1981 and ongoing tax problems, all vehicles purchased by Mr. Beatty have been titled in the name of Mrs. Beatty. All vehicles have been purchased from a friend/associate who owns a car dealership. The vehicles are always financed. Presently, the Mr. Beatty owns 2 vehicles: a 1996 Chevrolet van, bought and financed used in 1998 (balance owed is approximately $10,000, estimated resale value: $8,000); and a 1999 Dodge Ram work van, financed in 1999 (balance owed is approximately $16,000, estimate resale value $7,000). Mr. and Mrs. Beatty do not have any investments, do not have life insurance policies, and do not maintain any saving or retirement accounts. They do not own expensive artwork or collectibles, or live an extravagant lifestyle.**

a. How did you pay for these assets?

**Mr. Beatty financed the purchases of the residence and the vehicles.**

15. What assets do you currently own?

**See Answer to Question 14.**

a. Were any of the assets transferred to you from your spouse? **No.** [Reproduced literally.]

On September 19, 2002, a representative of respondent requested certain documents, including (1) documentation of petitioner's income and living expenses at that time, (2) documentation of any bankruptcies that petitioner was involved with

at that time, and (3) all bank statements and canceled checks that petitioner had with respect to any bank accounts that petitioner maintained individually, that Mr. Beatty maintained individually, or that they maintained jointly.  On November 5, 2002, petitioner provided such documents to respondent's representative.

On November 4, 2003, petitioner and Mr. Beatty filed Form 656, Offer in Compromise.  In response, an Internal Revenue Service (IRS) offer manager returned that form by letter dated November 21, 2003.  That letter stated in pertinent part:

> We are returning your Form 656, Offer in Compromise for the following reason(s):
>
> An offer will not be considered while a bankruptcy proceeding is open.
>
> All required tax returns have not been filed.

On August 19, 2004, respondent's Appeals Office (Appeals Office) sent petitioner a "Notice of Determination Concerning Your Request for Relief under the Equitable Relief Provision of Section 6015(f)" (notice of determination).  In the notice of determination, the Appeals Office denied petitioner relief under section 6015(f) with respect to, inter alia, taxable years 1988 through 1997 and 2000.  The notice of determination stated in pertinent part:

> We're writing to tell you that we've made a decision about your <u>February 28, 2002</u> request for innocent spouse relief under Section 6015(f) of the Internal Revenue Code. * * *

We've determined that, for the above tax years we cannot allow your request.  It has been determined that you do not meet the statutory criteria for granting of the innocent spouse relief. * * *

An attachment to the notice of determination stated in pertinent part:

### SUMMARY/RECOMMENDATION

Is the taxpayer entitled to innocent spouse relief under the provisions of IRC Section 6015(f)?

No.  It has been determined that the taxpayer is not entitled to equitable relief under the provisions of Section 6015(f).  Since the representative has expressed a desire to litigate this case it is recommended that a statutory notice of claim disallowance be issued.

### ADMINISTRATIVE

A related CDP case has been closed separately.  The outcome of that case has no bearing on this innocent spouse claim.

### BACKGROUND

Cynthia Beatty was born on June 6, 1955.  She attended Dulaney Valley high school, and obtained an associate degree from Villa Julie College in 1975.  Mrs. Beatty worked as a medical secretary for Washington Hospital Center in Washington, D.C. from 1975 to 1980.  From 1981 to approximately 1990, Mrs. Beatty was a full-time homemaker and assisted her husband with his deejay business (carrying equipment, pulling records, attending shows, etc.)  From 1990 until the summer of 1998, Mrs. Beatty was a full-time homemaker.  In the summer of 1998, she obtained seasonal employment (May through August) as a bartender with "BJ's South" in Ocean City, Maryland.  The following summer (1999), Mrs. Beatty obtained seasonal employment as a hostess for The Twinings, a restaurant in Ocean City, Maryland.  She returned to this position during the summers of 2000 and 2001.  None of Mrs. Beatty's employment positions involved financial responsibilities beyond basic cashier duties.

Mrs. Beatty met her husband, Michael Beatty, in 1974 in Cockeysville, Maryland, at a restaurant where Mr. Beatty was working as a manager. In 1976, Mr. Beatty was transferred to Prince George's County, Maryland, and purchased a house. Shortly thereafter, Mrs. Beatty moved in. They married in 1978. From the beginning of their marriage, Mrs. Beatty had no involvement in the family finances. She did not have or maintain checking accounts in her name. She did not discuss the family expenses with her husband; and was not involved in any financial decisions. In 1977, prior to their marriage, Mr. Beatty purchased a deli and bakery business, which he incorporated as "MKB Donut and Deli, Inc." He financed the business with an SBA loan. As a result of rapid growth and poor management, Mr. Beatty fell behind on his withholding tax obligations, and soon found himself facing federal tax liens and foreclosures. Mr. Beatty's business filed for bankruptcy protection in 1980. He eventually lost everything.

Having lost his business and all of his savings, Mr. Beatty was left looking for a way to support himself and his wife. A friend that was opening a bar in Ocean City, Maryland, offered to pay Mr. Beatty to help get the place in order in time for Memorial Day weekend (1981). Mr. Beatty agreed and he and his wife rented a room in Ocean City for $35 a night. When Mr. Beatty arrived at the bar, he learned that the bar was not permitted to have live entertainment. Mr. Beatty offered to provide deejay services during the busy holiday weekend. His friend accepted, and what was intended to be a one-time "gig" turned into a new job that lasted the summer of 1981. Mrs. Beatty helped in any way she could, from carrying equipment and pulling records, to doing her husband's laundry and getting him ready for each night. This continued until September 1981. As a result of his summer engagement, Mr. Beatty obtained jobs with various colleges in Maryland and Pennsylvania, as well as some bars and nightclubs in the Baltimore metropolitan area. At this point, the bank had foreclosed on the house purchased by Mr. Beatty in 1976. The Beatty's packed up their belongings and moved into a smaller apartment in Cockeysville, Maryland. Again, Mr. Beatty handled all the financial aspects of the relationship, including the apartment application process, paying the rent, paying household.

During this time, Mrs. Beatty was not aware that her husband was not filing federal or state income tax returns.  She had no reason to inquire about the finances, and always assumed that her husband was handling everything.  If she inquired about any particular financial issue, Mr. Beatty always told her not to worry about anything, that he had everything under control.  Mr. Beatty would give her money when she needed it to buy groceries or other miscellaneous items.  She never reviewed any correspondence or spoke with, any government agents or tax professionals about her husband's financial problems.  She never negotiated her husbands's business contracts, accepted payment from people he worked for, or discussed the business finances.

In April 1993, the Beattys moved into a townhouse in Ocean City, Maryland.  Mr. Beatty told Mrs. Beatty that they owned the property, and Mrs. Beatty went about fixing it up as necessary.  In fact, Mr. Beatty had negotiated with someone for whom he worked on a regular basis to rent the property with an option to buy.  Approximately 3 years later, the Beatty purchased the property.  Mr. Beatty explained to Mrs. Beatty that she just needed to sign the papers to make their ownership "official."

The Beattys did not maintain joint bank accounts.  The Beattys' vacations have been limited to short trips to nearby locations, which they can drive to and stay a few days in an inexpensive hotel.  Their only vehicle is a 1996 Chevy conversion van, which is owned by Mr. Beatty.  They do not drive luxury vehicles, do not have any investments, do not have life insurance policies, and do not maintain any saving or retirement accounts.  They do not own expensive artwork or collectibles, or live an extravagant lifestyle.  Mrs. Beatty has no idea, even today, how much her husband is earning, or the amount of his business expenses.  She does not know the cost of monthly household expenses.

In 1999, Mr. Beatty was charged with willful failure to file state income tax returns for 1995, 1996 and 1997.  He pled guilty on May 8, 2000.  On September 8, 2000, he was sentenced to 5 years on each count, with the entire sentence suspended, and 5 years supervised probation.  As a condition of his probation Mr. Beatty was required to file all federal and state tax returns

for the years 1995 through 1999, and all future tax returns. Shortly thereafter, the State of Maryland contacted Mr. Beatty's counsel and insisted that returns be filed for years beginning in 1988. Mr. Beatty and his accountant, Eric Vinson, immediately began working on the returns, using whatever records they could gather as well as estimated net income figures provided by the Office of the Comptroller. When the returns were prepared, Mr. Vinson told Mrs. Beatty to sign where indicated. He did not explain that, by signing the returns, she would be responsible for half of the taxes due. Having been present at her husband's sentencing, and having heard the stern warning from the court that, if these returns were not filed, her husband would be going to jail, Mrs. Beatty signed whatever was put in front of her.

The tax due for the years at issue are * * * solely the result of Mr. Beatty's income. In 1998, Mrs. Beatty earned $4,187, and had federal income tax of $164 withheld by her employer. In 1999, Mrs. Beatty earned $4,387, and had federal income tax of $366 withheld by her employer. Had she been advised to elect "married filing separately" filing status, she would have had no taxable income. Prior to 1998, Mrs. Beatty did not work outside the home.

Mrs. Beatty was adjudicated bankrupt under Chapter 7 on January 23, 2001. The returns were signed after that on November 6, 2001. Mr. Beatty was in bankruptcy previously. At the time the returns were signed, neither had sufficient credit to allow them to borrow the funds needed to pay the taxes.

    *       *       *       *       *       *       *

Revenue Procedure 2000-15 as amplified by the provisions of Revenue Procedure 2003-61 provides a list of elements to be developed to determine the extent, if any of relief to be granted under these innocent spouse provisions. * * * The merits and circumstances of each case will dictate the weight assigned to each factor in reaching a decision to grant or reject innocent spouse relief.

Divorced, separated or living apart for at least 12 months when claim is filed

This condition is not met.  Mr. & Mrs. Beatty are not divorced or separated.  They lived together during the years under consideration and are still living together.  Mrs. Beatty filed delinquent returns with her husband in November of 2001.

Payment of the tax liabilities would cause hardship

Economic hardship is defined as:  the payment of the tax would make it impossible to meet your basic living expenses for housing, clothing, food, transportation medical etc.  Reasonable belief that tax would be paid. Mr. Beatty is self-employed, yearly household income fluctuates to some extent.  Current expense information was gathered from an interview as well as from a check spread performed using 2000 bank records.  Income information was derived from tax returns filed for 2001.  (The most recent return filed)  Comparison of monthly household income to monthly basic living expenses indicates that the Beattys are having financial difficulties.  This is also evident from the bankruptcies that have been filed.  The question is not whether hardship exists, but whether a hardship will be created if innocent spouse relief is not granted.  In this case, hardship already exists and will continue to exist whether or not relief is granted to Mrs. Beatty. The two still live in the same household so even if [she] is relieved, Mr. Beatty's liability will impact on the family's ability to pay personal living expenses.  This condition is not met.

Attribution

Mrs. Beatty's attorney states that having heard the stern warning from the court that if returns were not filed her husband would go to jail, Mrs. Beatty signed whatever was placed in front of her.  She contends that this caused Mrs. Beatty to do something she wouldn't ordinarily have done.  The liability is solely attributable to Mr. Beatty's income and Mrs. Beatty did not receive a significant benefit from the unpaid taxes beyond that of minimal living expenses.  The underpayments of tax are attributed to Mr. Beatty.  The taxpayer alone did not have sufficient income to require her to file a return.  The tax liabilities rest solely with Mr. Beatty for failure to file timely returns and to pay his income tax annually.

Marital Abuse

If abuse does not rise to the level duress, then the electing spouse's level of influence with respect to the unpaid tax must be evaluated.
There have not been any claims of marital abuse.

The representative explained that duress is the most compelling reason for requesting equitable relief. Mrs. Beatty would not have signed joint tax returns with her husband if she had not heard the judge order returns to be filed. She feared that her husband would go to jail if she did not sign the returns presented to her. Mrs. Beatty did not have a filing obligation of her own because she had withholdings from her paycheck to more than cover any taxes due on her own income. She certainly would not have filed jointly if she had understood the ramifications.

Mrs. Beatty signed the tax returns under duress. The returns may be invalid joint return.

Joint Returns: Joint and Several Liability: Duress, fraud or misrepresentation

A wife was liable for tax on a joint return where the evidence failed to show that she was unwilling to sign the return or that her husband made her sign the return under threat of force. Fear alone is insufficient to prove duress.

Although it is unfortunate that Mrs. Beatty was not aware of and was not informed of her options, ignorance of the law is no excuse. Mrs. Beatty cannot be relieved of her joint liability simply because she didn't know the tax laws. In order for duress to be a factor, Mrs. Beatty would have to show that she had no choice and that she was reluctant to sign a joint return. In this case, Mrs. Beatty did have a choice. She could have filed separately whether or not she realized it at the time. Further, she was not reluctant to sign the joint returns. In fact, she was eager to do whatever was asked of her at the time. No one forced Mrs. Beatty to sign joint tax returns against her will. Duress did not occur and is not a factor to consider in this case.

Reasonable belief that the tax would be paid:

Mrs. Beatty states that she did not review the returns and had no idea of the amount of taxes due, if any. Since Mrs. Beatty signed the returns without looking at any of the figures, she had no information to make the determination as to whether the taxes could be paid or not.  Mrs. Beatty and her attorney mentioned on numerous occasions that she just signed without questioning because she believed her husband would go to jail if she didn't sign.  There was no thought given at that point in time as to whether or not the taxes would be paid.  Therefore, there was no belief that the taxes would be paid.

Non-requesting spouse's legal obligation to pay
A stipulation in the property settlement or a decree of divorce must be evidenced that requires the non electing spouse to assume responsibility for the unpaid income taxes for the periods at issue.  Since the parties are still married and living together a marital agreement such as this does not exist.

Knowledge

She signed the joint tax returns because her husband was under court order to file returns with both the State of Maryland and the federal government.  He was charged with willful failure to file tax returns by the State.  In order to receive a reduced sentence, he was required to file all returns or face a substantial jail sentence.  Mrs. Beatty was not involved in the tax preparation process.  Returns were prepared using extrapolations and estimates computed by the State of Maryland.  Mr. Beatty had some documentation for business expenses but was not very good at keeping the documentation.  When the returns were completed, Mr. and Mrs. Beatty went to the CPA's office.  She did not review or question the returns and signed them.

Significant Benefit

Other than usual and customary living expenses there is no evidence to indicate that you derived a significant benefit from the failure to report these sources of income.  The Beatty's did not live extravagantly or take trips, they didn't have any investments, life insurance, savings, or anything else of value to show

for the money earned. When Mrs. Beatty became aware of the amount of money her husband earned, she couldn't understand where the funds went. She then found out that her husband had a problem with Keno gambling. He lost their money and then became involved with loan sharks to fund his addiction. Other than customary basic living expenses the taxpayer did not derive a significant benefit from the unpaid federal income taxes.

## DETERMINATION

We look to the court case of Alice Berger, et al. v. Commissioner T.C. Memo. 1996-76, 71 TCM 2160. Alice Berger asserts that the Chancery Court ordered her to sign the 1988 return and that she signed it because she believed she had no choice and was afraid of the "consequences" of defying a court order. Although she signed the return at the courthouse, she does not appear to have been signed it before a judge who was threatening improper or oppressive "consequences against her. Alice Berger did not testify that the Chancery Court had threatened "consequences" directly to her. This court case demonstrates that signing a return at the order of a Court because one is afraid of the "consequences" of defying a court order does not equal a showing of abuse of discretion or theat of improper sanction sufficient to invalidate the return. In Mrs. Beatty's case, the court didn't even ask her to sign returns. The court didn't abuse its authority and did not force Mrs. Beatty to sign joint tax returns.

Another court case of interest is Hazel Stanley v. Comm. 45 TC 555. Mrs. Stanley's husband was very domineering and sometimes violent. She would go along with her husband in many situations simply to avoid conflict. Mrs. Stanley signed joint returns as directed by her husband. However, she failed to demonstrate that she did so unwillingly and was found to be jointly liable. Mrs. Beatty does not claim any undue influence from her husband; however the important point to note in this case is the "willingness" to file jointly. Like Mrs. Stanley, Mrs. Beatty has not demonstrated that she filed unwillingly.

Although it is unfortunate that Mrs. Beatty was not aware of and was not informed of her options, ignorance of the law is no excuse. Mrs. Beatty cannot be re-

lieved of her joint liability simply because she didn't know the tax laws and their impact on her.

The taxpayer had complete awareness of the balances due when the returns were filed. She was well aware that the family did not have the funds to pay the tax. She did not have a reasonable belief that the taxes would be paid. It has been established that the taxpayer's do not qualify for economic hardship. The representative had made reference to a substantial gambling debt that she insists causes economic hardship. However she has failed to submit documentation of such an expense.

The taxpayers still reside together as a married couple. Abuse is not a factor. The taxpayer claims that the level of duress caused by this situation merits innocent spouse relief. This is a misnomer as explained. The cumulative effect of the development of these equitable relief elements clearly demonstrates that the taxpayer does not qualify for innocent spouse relief under the provisions of IRC Section 6015(f).

CONCLUSION

Since the taxpayer will not execute a form 870-IS and has expressed her intention to litigate this matter there remains no alternative but to recommend that a statutory notice of claim disallowance be issued. [Reproduced literally.]

On December 29, 2004, petitioner and Mr. Beatty refinanced the mortgage loan on the house in which they resided. Around January 4, 2005, petitioner and Mr. Beatty used funds that they received from that refinancing to make a $151,423.56 payment to the IRS with respect to the unpaid liabilities for the taxable years 1998 and 1999. After the refinancing of the mortgage loan on their house, petitioner and Mr. Beatty had no equity in that house and were required to make a monthly mortgage loan payment of $3,400.

During 2004, petitioner received $12,906 as an employee of RIG, Inc., as well as $1,274 in unemployment compensation. On January 6, 2006, petitioner filed late a Federal return for her taxable year 2004 (2004 return) that showed a $2 refund due.

On January 6, 2006, petitioner submitted to respondent Form 433-A, Collection Information Statement for Wage Earners and Self-Employed Individuals (Form 433-A). That form contained several sections identified as section 1 through 9. In section 2 of Form 433-A that petitioner submitted to respondent (petitioner's Form 433-A), petitioner did not respond to a question relating to whether she or Mr. Beatty was self-employed or operated a business, although she indicated in section 3 of that form that she was unemployed. In section 3 of petitioner's Form 433-A, petitioner did not indicate whether Mr. Beatty was employed.

In section 5 of petitioner's Form 433-A, petitioner indicated that she (1) maintained a checking account with a $200 account balance, (2) had $50 cash on hand, (3) had a credit card balance of $400, (4) owed $4,700 with respect to an equity line of credit, and (5) had $400 of credit available to her.

In sections 5 and 6 of petitioner's Form 433-A, petitioner provided the responses indicated to the following questions:

16. LIFE INSURANCE. Do you have life insurance with a cash value? ☒ No ☐ Yes

      *        *        *        *        *        *        *

17a. Are there any garnishments against your wages?
     ☒ No  ☐ Yes


   *      *      *      *      *      *      *


17b. Are there any judgments against you?  ☒ No  ☐ Yes


   *      *      *      *      *      *      *


17d. Did you ever file bankruptcy?  ☐ No  ☒ Yes

     If yes, date filed <u>9/14/2000</u> Date discharged
     <u>12/27/2000</u>

17e. In the past 10 years did you transfer any assets
     out of your name for less than their actual value?
     ☒ No  ☐ Yes


   *      *      *      *      *      *      *


17f. Do you anticipate any increase in household income
     in the next two years?  ☐ No  ☒ Yes

     If yes, why will the income increase?  <u>I hope to</u>
     <u>find seasonal employment</u> * * *

     How much will it increase?  $<u> ??? In 2004, I</u>
     <u>earned $12,906</u>

17g. Are you a beneficiary of a trust or estate?
     ☒ No  ☐ Yes


   *      *      *      *      *      *      *


17h. Are you a participant in a profit sharing plan?
     ☒ No  ☐ Yes

In section 7 of petitioner's Form 433-A, petitioner indi-
cated that she owned (1) a 2005 Jeep Liberty valued at $18,785
with respect to which there was a $23,000 outstanding loan
balance and (2) two vehicles, neither of which had any value.  In
section 7 of petitioner's Form 433-A, petitioner also indicated

that in 1991 she purchased real estate in Ocean City for $130,000, that the current value of that real estate was $500,000, and that there was a $450,000 outstanding mortgage loan with respect to that real estate, which was required to be paid in full in 2035.

In section 7 of petitioner's Form 433-A, petitioner indicated that she had personal assets valued at $6,000.

Section 9 of Form 433-A listed various income items and various living expense items. With respect to the income items listed in that section, petitioner stated that she was unemployed. With respect to the expense items listed in section 9 of Form 433-A, petitioner indicated that she had total monthly living expenses of $4,003, consisting of $3,600 of monthly expenses for housing and utilities and $403 of monthly expenses for food, clothing, housekeeping supplies, and personal care products.

OPINION

We review respondent's denial of relief under section 6015(f) for abuse of discretion. Butler v. Commissioner, 114 T.C. 276, 292 (2000). Respondent's denial of such relief constitutes an abuse of discretion if such denial was arbitrary, capricious, or without sound basis in fact or law. Woodral v. Commissioner, 112 T.C. 19, 23 (1999). The question whether respondent's denial of relief under section 6015(f) was arbi-

trary, capricious, or without sound basis in fact is a question of fact.  <u>Cheshire v. Commissioner</u>, 115 T.C. 183, 197-198 (2000), affd. 282 F.3d 326 (5th Cir. 2002).

Petitioner bears the burden of proving that respondent abused respondent's discretion in denying her relief under section 6015(f).  See <u>Jonson v. Commissioner</u>, 118 T.C. 106, 125 (2002), affd. 353 F.3d 1181 (10th Cir. 2003).  That this case was submitted under Rule 122 does not change that burden or the effect of a failure of proof.  See Rule 122(b); <u>Borchers v. Commissioner</u>, 95 T.C. 82, 91 (1990), affd. 943 F.2d 22 (8th Cir. 1991).

Section 6015(f) grants respondent discretion to relieve an individual who files a joint return from joint and several liability with respect to that return.  That section provides:

>     SEC. 6015.  RELIEF FROM JOINT AND SEVERAL LIABILITY ON
>                 JOINT RETURN.
>
>     *     *     *     *     *     *     *
>
>         (f) Equitable Relief.--Under procedures prescribed
>     by the Secretary, if--
>
>             (1) taking into account all the facts
>         and circumstances, it is inequitable to hold
>         the individual liable for any unpaid tax or
>         any deficiency (or any portion of either);
>         and
>
>             (2) relief is not available to such individ-
>         ual under subsection (b) or (c),
>
>     the Secretary may relieve such individual of such
>     liability.

In the instant case, the parties agree that relief is not available to petitioner under section 6015(b) or (c), thereby satisfying section 6015(f)(2). They disagree over whether petitioner is entitled to relief under section 6015(f).

As directed by section 6015(f), respondent has prescribed procedures in Rev. Proc. 2003-61, 2003-2 C.B. 296 (Revenue Procedure 2003-61)[2] that are to be used in determining whether it would be inequitable to find the requesting spouse liable for part or all of the liability in question. Section 4.01 of Revenue Procedure 2003-61 lists seven conditions (threshold conditions) which must be satisfied before the IRS will consider a request for relief under section 6015(f). In the instant case, respondent concedes that those conditions are satisfied. Where, as here, the requesting spouse satisfies the threshold conditions, section 4.01 of Revenue Procedure 2003-61 provides that a requesting spouse may be relieved under section 6015(f) of all or part of the liability in question if, taking into account all the facts and circumstances, respondent determines that it would be

[2]We note that Revenue Procedure 2003-61 superseded Rev. Proc. 2000-15, 2000-1 C.B. 447. Revenue Procedure 2003-61 is effective for requests for relief under sec. 6015(f) which were filed on or after Nov. 1, 2003, and for requests for such relief which were pending on, and for which no preliminary determination letter had been issued as of, that date. Rev. Proc. 2003-61, sec. 7, 2003-2 C.B. at 299. Revenue Procedure 2003-61 is applicable in the instant case. That is because as of Nov. 1, 2003, no preliminary determination letter had been issued to petitioner with respect to petitioner's request for relief under sec. 6015(f), and that request was still pending.

inequitable to hold the requesting spouse liable for such liabil-
ity.

Where, as here, the requesting spouse satisfies the thresh-
old conditions, section 4.02(1) of Revenue Procedure 2003-61 sets
forth the circumstances under which respondent ordinarily will
grant relief to that spouse under section 6015(f) in a case, like
the instant case, where a liability is reported in a joint return
but not paid.  Petitioner concedes that she does not qualify for
relief under section 4.02(1) of Revenue Procedure 2003-61.
Instead, she relies on section 4.03 of that revenue procedure in
support of her claim for relief under section 6015(f).
Section 4.03 of Revenue Procedure 2003-61 provides a list of
factors which respondent is to take into account in considering
whether to grant an individual relief under section 6015(f).  No
single factor is to be determinative in any particular case; all
factors are to be considered and weighed appropriately; and the
list of factors is not intended to be exhaustive.  Rev. Proc.
2003-61, sec. 4.03, 2003-2 C.B. at 298.

As pertinent here, section 4.03(2)(a) of Revenue Procedure
2003-61 sets forth the following factors which are to be consid-
ered and weighed appropriately:

> (i) <u>Marital status</u>.  Whether the requesting spouse
> is separated (whether legally separated or living
> apart) or divorced from the nonrequesting spouse. * * *

> (ii) <u>Economic hardship</u>.  Whether the requesting
> spouse would suffer economic hardship (within the

meaning of section 4.02(1)(c) of this revenue proce-
dure) if the Service does not grant relief from the
income tax liability.

(iii) <u>Knowledge or reason to know</u>.

(A) <u>Underpayment cases</u>.  In the case of an income
tax liability that was properly reported but not paid,
whether the requesting spouse did not know and had no
reason to know that the nonrequesting spouse would not
pay the income tax liability.

\*      \*      \*      \*      \*      \*      \*

(C) <u>Reason to know</u>.  For purposes of (A) \* \* \*
above, in determining whether the requesting spouse had
reason to know, the Service will consider the request-
ing spouse's level of education, any deceit or evasive-
ness of the nonrequesting spouse, the requesting
spouse's degree of involvement in the activity generat-
ing the income tax liability, the requesting spouse's
involvement in business and household financial mat-
ters, the requesting spouse's business or financial
expertise, and any lavish or unusual expenditures
compared with past spending levels.

(iv) <u>Nonrequesting spouse's legal obligation</u>.
Whether the nonrequesting spouse has a legal obligation
to pay the outstanding income tax liability pursuant to
a divorce decree or agreement. \* \* \*

(v) <u>Significant Benefit</u>.  Whether the requesting
spouse received significant benefit (beyond normal
support) from the unpaid income tax liability or item
giving rise to the deficiency.  <u>See</u> Treas. Reg.
§1.6015-2(d).

(vi) <u>Compliance with income tax laws</u>.  Whether the
requesting spouse has made a good faith effort to
comply with income tax laws in the taxable years fol-
lowing the taxable year or years to which the request
for relief relates.

(We shall hereinafter refer to the factors set forth in section

4.03(2)(a)(i), (ii), (iii), (iv), (v), and (vi) of Revenue

Procedure 2003-61 as the marital status factor, the economic

hardship factor, the knowledge or reason to know factor, the legal obligation factor, the significant benefit factor, and the tax law compliance factor, respectively.)

Section 4.03(2)(b) of Revenue Procedure 2003-61 sets forth the following factors which, if present in a case, will weigh in favor of granting an individual relief under section 6015(f), but will not weigh against granting such relief if not present:

> (i) <u>Abuse</u>.  Whether the nonrequesting spouse abused the requesting spouse. * * *

> (ii) <u>Mental or physical health</u>.  Whether the requesting spouse was in poor mental or physical health on the date the requesting spouse signed the return or at the time the requesting spouse requested relief. The Service will consider the nature, extent, and duration of illness when weighing this factor.

(We shall hereinafter refer to the factors set forth in section 4.03(2)(b)(i) and (ii) as the abuse factor and the mental or physical health factor, respectively.)

Before turning to the factors set forth in section 4.03(2)(a) and (b) of Revenue Procedure 2003-61, we address respondent's position that, in determining whether petitioner is entitled to relief under section 6015(f), we should consider only respondent's administrative record with respect to petitioner's taxable years at issue.  We stated our position on that issue in <u>Ewing v. Commissioner</u>, 122 T.C. 32 (2004).  In <u>Ewing</u>, we held that our determination of whether a taxpayer is entitled to relief under section 6015(f) "is made in a trial de novo and is

not limited to matter contained in respondent's administrative record". Id. at 44. Respondent urges us to reconsider that position since the United States Court of Appeals for the Ninth Circuit vacated our decision in Ewing on jurisdictional grounds.[3] See Commissioner v. Ewing, 439 F.3d 1009 (9th Cir. 2006), revg. 118 T.C. 494 (2002), vacating 122 T.C. 32 (2004).

Assuming arguendo that we were to accept respondent's position that, in determining whether petitioner is entitled to relief under section 6015(f), we should consider only respondent's administrative record with respect to petitioner's taxable years at issue, on the record before us, we find that petitioner has carried her burden of showing that respondent abused respondent's discretion in denying her such relief with respect to the unpaid liabilities for the years at issue.[4] We turn now to the factors set forth in section 4.03(2)(a) of Revenue Procedure

[3]In further support of respondent's position that, in determining whether petitioner is entitled to relief under sec. 6015(f), we should consider only respondent's administrative record with respect to petitioner's taxable years at issue, respondent relies on Robinette v. Commissioner, 439 F.3d 455 (8th Cir. 2006), revg. 123 T.C. 85 (2004), a case under sec. 6330. The Court to which an appeal in this case would ordinarily lie is the United States Court of Appeals for the Fourth Circuit. We are not bound by Robinette. See Golsen v. Commissioner, 54 T.C. 742, 757 (1970), affd. 445 F.2d 985 (10th Cir. 1971).

[4]If, as we held in Ewing v. Commissioner, 122 T.C. 32 (2004), we were to consider in this case respondent's administrative record with respect to petitioner's taxable years at issue as well as matters that the parties stipulated that are not part of that administrative record, our holding under sec. 6015(f) would remain the same.

2003-61 that support our finding.

With respect to the marital status factor set forth in section 4.03(2)(a)(i) of that revenue procedure, the parties agree on brief that that factor is neutral.

However, the notice of determination stated in pertinent part:

> Divorced, separated or living apart for at least 12 months when claim is filed
>
> This condition is not met. Mr. & Mrs. Beatty are not divorced or separated. They lived together during the years under consideration and are still living to-gether. * * *

As we understand it, the Appeals Office concluded in the notice of determination that the marital status factor weighed against granting petitioner relief under section 6015(f). We reject that conclusion as unfounded. We agree with the parties' position on brief, and we find, that the marital status factor is neutral.

With respect to the economic hardship factor set forth in section 4.03(2)(a)(ii) of Revenue Procedure 2003-61,[5] petitioner

---

[5]In determining whether a requesting spouse will suffer economic hardship, sec. 4.02(1)(c) of Revenue Procedure 2003-61, to which sec. 4.03(2)(a)(ii) of that revenue procedure refers, requires reliance on rules similar to those provided in sec. 301.6343-1(b)(4), Proced. & Admin. Regs. Sec. 301.6343-1(b)(4), Proced. & Admin. Regs., generally provides that an individual suffers an economic hardship if the individual is unable to pay his or her reasonable basic living expenses. Sec. 301.6343-1(b)(4), Proced. & Admin. Regs., provides, in pertinent part:

(continued...)

argues that that factor weighs in favor of granting her relief under section 6015(f).  On brief, respondent contends that not granting such relief will have no effect on petitioner's economic situation.[6]

_____

[5](...continued)
        (ii) <u>Information from taxpayer</u>.--In determining a reasonable amount for basic living expenses the director will consider any information provided by the taxpayer including--

        (A) The taxpayer's age, employment status and history, ability to earn, number of dependents, and status as a dependent of someone else;

        (B) The amount reasonably necessary for food, clothing, housing (including utilities, home-owner insurance, home-owner dues, and the like), medical expenses (including health insurance), transportation, current tax payments (including federal, state, and local), alimony, child support, or other court-ordered payments, and expenses necessary to the taxpayer's production of income (such as dues for a trade union or professional organization, or child care payments which allow the taxpayer to be gainfully employed);

        (C) The cost of living in the geographic area in which the taxpayer resides;

        (D) The amount of property exempt from levy which is available to pay the taxpayer's expenses;

        (E) Any extraordinary circumstances such as special education expenses, a medical catastrophe, or natural disaster; and

        (F) Any other factor that the taxpayer claims bears on economic hardship and brings to the attention of the director.

[6]On brief, respondent contends in pertinent part with respect to the economic hardship factor that petitioner

(continued...)

However, the notice of determination stated in pertinent

part:

> Mr. Beatty is self-employed, yearly household income
> fluctuates to some extent.  Current expense information
> was gathered from an interview as well as from a check
> spread performed using 2000 bank records.  Income in-
> formation was derived from tax returns filed for 2001.
> (The most recent return filed)  Comparison of monthly
> household income to monthly basic living expenses indi-
> cates that the Beattys are having financial difficul-
> ties.  This is also evident from the bankruptcies that
> have been filed.  The question is not whether hardship
> exists, but whether a hardship will be created if inno-
> cent spouse relief is not granted.  In this case, hard-
> ship already exists and will continue to exist whether
> or not relief is granted to Mrs. Beatty.  The two still
> live in the same household so even if [she] is
> relieved, Mr. Beatty's liability will impact on the
> family's ability to pay personal living expenses.  This
> condition is not met.  [Reproduced literally.]

As we understand it, the Appeals Office concluded in the

notice of determination that the economic hardship factor weighed

against granting petitioner relief under section 6015(f) because

---

[6](...continued)
provided respondent with no evidence of this economic
hardship. * * * Whether she is jointly liable for the
income tax or not does not affect her economic
situation:  she does not have any economic
responsibilities.

> *　　　*　　　*　　　*　　　*　　　*　　　*

> * * * Accordingly, petitioner will not experience
economic hardship if relief is not granted. * * *

Respondent's administrative record with respect to
petitioner's taxable years at issue belies respondent's position
on brief about the economic hardship factor.  As quoted below,
the notice of determination, which was based upon that record,
also belies that position.

the Appeals Office's failure to grant such relief would not "create" economic hardship, since economic "hardship already exists and will continue to exist whether or not relief is granted to Mrs. Beatty."  We reject as unfounded the rationale stated by the Appeals Office for its conclusion that the economic hardship factor weighed against granting petitioner relief under section 6015(f).  The Appeals Office implicitly acknowledged in the notice of determination that payment of the unpaid liabilities for the years at issue would cause even greater economic hardship than already existed.[7]  We find that the economic hardship factor weighs in favor of granting petitioner relief under section 6015(f).

With respect to the knowledge or reason to know factor set forth in section 4.03(2)(a)(iii) of Revenue Procedure 2003-61, petitioner argues that she did not know and had no reason to know that Mr. Beatty would not pay the tax shown due in each of the respective joint returns for the years at issue and that therefore that factor weighs in favor of granting her relief under

---

[7]Additional facts not presented to the Appeals Office but presented to the Court further support what the Appeals Office implicitly acknowledged.  For example, on Dec. 29, 2004, petitioner and Mr. Beatty refinanced the mortgage loan on the house in which they resided.  On or about Jan. 4, 2005, petitioner and Mr. Beatty used $151,423.56 of the funds that they received from that refinancing to pay their unpaid liabilities for 1998 and 1999.  After the refinancing of the mortgage loan on their house, petitioner and Mr. Beatty had no equity in that house and were required to make a monthly mortgage payment of $3,400 on that refinanced loan.

section 6015(f).  Respondent disagrees.

The notice of determination stated in pertinent part:

> Mrs. Beatty states that she did not review the returns
> and had no idea of the amount of taxes due, if any.
> Since Mrs. Beatty signed the returns without looking at
> any of the figures, she had no information to make the
> determination as to whether the taxes could be paid or
> not.  Mrs. Beatty and her attorney mentioned on numer-
> ous occasions that she just signed without questioning
> because she believed her husband would go to jail if
> she didn't sign.  There was no thought given at that
> point in time as to whether or not the taxes would be
> paid.  Therefore, there was no belief that the taxes
> would be paid.

In support of her argument that the knowledge or reason to
know factor set forth in section 4.03(2)(a)(iii) of Revenue
Procedure 2003-61 weighs in favor of granting her relief under
section 6015(f), petitioner asserts:

> Petitioner acknowledged in her responses set forth
> on the Innocent Spouse Questionnaire * * * that she did
> not review the returns prior to signing and therefore,
> had no actual knowledge of the tax reported on the
> returns, or actual knowledge that the tax reported
> would not be paid.  Petitioner further believed that,
> based on the Beattys standard of living, they had very
> little income and thus, had no reason to know that Mr.
> Beatty would not pay, or be able to pay, the tax due.
> * * * Petitioner did not know that Mr. Beatty had a
> long-time Keno gambling problem or that he was spending
> significant sums betting on Keno and repaying high
> interest rate advances to loansharks. * * * Since Mr.
> Beatty had been ordered by the court in his criminal
> proceedings to file his missing returns, it was cer-
> tainly reasonable for Petitioner to believe that Mr.
> Beatty would ultimately pay the tax due.
>
> In addition, Petitioner did not understand that
> she was not required to file a return for most of the
> years at issue, or that she had the option of filing
> separately for those years she was required to file
> (1998, 1999 and 2000).  Petitioner also did not under-

stand that she would be liable for any tax owed on Mr. Beatty's self-employment income. * * * Mr. Beatty's accountant, Mr. Vinson, told Agent Renshaw that "he didn't think about any impact on Mrs. Beatty when returns were prepared and filed. He didn't explain the implications of filing jointly or notify them [the Beattys] that they had a choice. He figured they didn't have any assets anyway so he didn't give it any thought." In this regard, Petitioner is similar to the taxpayer in Washington v. Commissioner, 120 T.C. 137 (2003).[8] [Reproduced literally.]

We turn first to petitioner's reliance on Washington v. Commissioner, 120 T.C. 137 (2003).[9] In Washington, the taxpayer took the position that she relied on her spouse to pay the tax shown due in the return in question and that she believed that her spouse would pay such tax. In contrast, in the instant case, petitioner took the position before the IRS, and takes the posi-

---

[8]Despite the above-quoted assertions of petitioner, she acknowledges on brief that

ignorance of the law does not excuse a spouse from joint and several liability for tax due on a joint return under § 6013(d)(3). Petitioner further acknowledges prior decisions of this court that charge a taxpayer with constructive knowledge of the underpayment where the taxpayer signed the returns without reviewing them, and a duty to inquire "whether such a tax shown due would be paid." Simon v. Commissioner, T.C. Memo. 2005-220 (and cases cited therein); see also Weist [sic] v. Commissioner, T.C. Memo. 2003-91.

[9]In support of her argument that she did not know and had no reason to know that Mr. Beatty would not pay the tax shown due in each of the respective joint returns for the years at issue, petitioner also cites Keitz v. Commissioner, T.C. Memo. 2004-74, and Levy v. Commissioner, T.C. Memo. 2005-92. We find those cases to be materially distinguishable from the instant case and petitioner's reliance on them to be misplaced.

tion before the Court, that at the time she signed each of the respective joint returns for the years at issue (1) she did not know that each such return showed tax due, and (2) therefore she did not know at that time that Mr. Beatty would not pay such tax. On the record before us, we find Washington v. Commissioner, supra, to be materially distinguishable from the instant case and petitioner's reliance on that case to be misplaced.

We address now whether petitioner has carried her burden of establishing that the knowledge or reason to know factor weighs in favor of granting relief. In support of her position for relief under section 6015(f), petitioner chose to present her case to the IRS and to the Court by claiming that she did not know that there was a tax shown due in each of the respective joint returns for the years at issue. Petitioner must bear the consequences of that choice. Assuming arguendo that we were to accept petitioner's contention that she did not know that each of the joint returns for the years at issue showed tax due, on the record before us, we find that, by signing each such return, petitioner is charged with constructive knowledge of, inter alia, the tax shown due therein. See Park v. Commissioner, 25 F.3d 1289, 1299 (5th Cir. 1994), affg. T.C. Memo. 1993-252; see also Hayman v. Commissioner, 992 F.2d 1256, 1262 (2d Cir. 1993), affg. T.C. Memo. 1992-228. We further find that petitioner should have inquired about whether the tax shown due in each of the joint

returns for the years at issue, as to which she had constructive knowledge, would be paid. It would be inequitable to allow petitioner to turn a blind eye to the tax shown due in each such return. The amount of such tax was large enough as to put petitioner on notice that further inquiry should be made as to whether it would be paid. She failed to do so. Petitioner thus failed to present any evidence to the IRS and to the Court with respect to whether the tax shown due in each of the respective joint returns for the years at issue would be paid. We find that the knowledge or reason to know factor weighs against granting petitioner relief under section 6015(f).

With respect to the legal obligation factor set forth in section 4.03(2)(a)(iv) of Revenue Procedure 2003-61, the parties agree on brief that that factor is neutral.

However, the notice of determination stated in pertinent part:

Non-requesting spouse's legal obligation to pay

A stipulation in the property settlement or a decree of divorce must be evidenced that requires the non electing spouse to assume responsibility for the unpaid income taxes for the periods at issue. Since the parties are still married and living together a marital agreement such as this does not exist.

As we understand it, the Appeals Office concluded in the notice of determination that the legal obligation factor weighed against granting petitioner relief under section 6015(f). We reject that conclusion as unfounded. We agree with the parties'

position on brief, and we find, that the legal obligation factor is neutral.

With respect to the significant benefit factor set forth in section 4.03(2)(a)(v) of Revenue Procedure 2003-61, petitioner argues that that factor weighs in favor of granting her relief under section 6015(f). On brief, respondent argues that the significant benefit factor is neutral.

> The notice of determination stated in pertinent part:

> Other than usual and customary living expenses there is no evidence to indicate that you derived a significant benefit from the failure to report these sources of income. The Beatty's did not live extravagantly or take trips, they didn't have any investments, life insurance, savings, or anything else of value to show for the money earned. When Mrs. Beatty became aware of the amount of money her husband earned, she couldn't understand where the funds went. She then found out that her husband had a problem with Keno gambling. He lost their money and then became involved with loan sharks to fund his addiction. Other than customary basic living expenses the taxpayer did not derive a significant benefit from the unpaid federal income taxes. [Reproduced literally.]

As we understand it, although the Appeals Office found in the notice of determination that petitioner did not receive a significant benefit from the failure to pay the unpaid liabilities for the years at issue,[10] that office did not conclude that therefore the significant benefit factor weighed in favor of granting petitioner relief under section 6015(f). We reject as

---

[10]On brief, respondent agrees that petitioner did not receive a significant benefit from the failure to pay the unpaid liabilities for the taxable years at issue.

unfounded the Appeals Office's failure to conclude in the notice of determination that the significant benefit factor favored granting petitioner such relief.  Under cases where Revenue Procedure 2003-61 is applicable, we consider the lack of significant benefit by the taxpayer seeking relief from joint and several liability to be a factor that favors granting relief under section 6015(f).[11]  We find that the significant benefit factor weighs in favor of granting petitioner relief under section 6015(f).

With respect to the tax law compliance factor set forth in section 4.03(2)(a)(vi) of Revenue Procedure 2003-61, petitioner argues that that factor weighs in favor of granting her relief under section 6015(f).  On brief, respondent asserts:

> If the Court restricts itself to the administrative record then this factor favors petitioner.  If the Court considers information outside of the administrative record then this factor weighs against relief. [Reproduced literally.]

The notice of determination failed to address whether petitioner made a good faith effort to comply with the tax laws for any of the taxable years following the taxable years at issue. However, respondent acknowledges on brief that petitioner "ap-

---

[11]See <u>Magee v. Commissioner</u>, T.C. Memo. 2005-263.  We also note that, based on cases decided under former sec. 6013(e), we consider the lack of significant benefit by the taxpayer seeking relief from joint and several liability to be a factor that favors granting relief under sec. 6015(f).  <u>Ferrarese v. Commissioner</u>, T.C. Memo. 2002-249.

pears to have been compliant at the time the Notice of Determination was issued." We reject as unfounded the Appeals Office's failure to conclude in the notice of determination that the tax law compliance factor favored granting petitioner relief under section 6015(f).

After the Appeals Office issued the notice of determination, petitioner failed to file timely her 2004 return that showed a $2 refund due. We find that petitioner's failure to file timely her 2004 return weighs against granting petitioner relief under section 6015(f). However, given (1) that petitioner's noncompliance is limited to only one delinquently filed return for 2004 that showed a refund due and (2) the other facts and circumstances in the instant case, we further find that the tax law compliance factor is not a significant factor weighing against relief in this case.

We turn now to the factors set forth in section 4.03(2)(b) of Revenue Procedure 2003-61. The parties agree, and we find, that the abuse factor and the mental or physical health factor set forth in section 4.03(2)(b)(i) and (ii), respectively, of Revenue Procedure 2003-61 are neutral.

Based upon our examination of the entire record before us, we find that petitioner has carried her burden of showing that respondent abused respondent's discretion when the Appeals Office determined in the notice of determination to deny her relief

under section 6015(f) with respect to the unpaid liabilities for the years at issue.[12]

We have considered all of the contentions and arguments of the parties that are not discussed herein, and we find them to be without merit, irrelevant, and/or moot.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for petitioner</u>.

---

[12]Our finding is the same regardless whether we limit our consideration to respondent's administrative record with respect to petitioner's taxable years at issue.